No. 48,072

STATE OF KANSAS, *Appellee*, v. CHARLES GOODSEAL, a/k/a CHARLES JONES, *Appellant*.

(553 P. 2d 279)

Opinion filed July 23, 1976.

*Michael D. Gragert,* of Hiebsch, Robbins and Tinker, of Wichita, argued the cause, and was on the brief for the appellant.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Keith Sanborn,* district attorney, and *Christopher Randall,* assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.:   This is an appeal from a conviction of first degree murder.

Appellant Charles Goodseal, also known as Charles Jones, was initially charged and tried upon three separate counts arising from the same incident: Unlawful possession of a firearm (K. S. A. 21-4204 [1] [*b*]), aggravated robbery (K. S. A. 21-3427), and felony murder (K. S. A. 21-3401). The murder count charged that the homicide occurred during the perpetration of the crimes of unlawful possession of a firearm and aggravated robbery. At this first trial appellant was convicted of unlawful possession of a firearm (from which no appeal has been taken), he was acquitted upon the aggravated robbery count and the jury was unable to agree as to the murder charge. Upon a second trial appellant was convicted of murder in the first degree, done in the commission of a felony,

unlawful possession of a firearm after a felony conviction. Appellant brings the murder conviction here for review.

The evidence revealed the following. In August, 1969, appellant Goodseal was released from the Kansas state industrial reformatory where he had been serving sentences imposed upon two counts of forcible rape. In December, 1973, he left his home in Wichita to seek employment in Denver, Colorado. While there he stayed with a friend, Carl Davis. Davis testified appellant handled a .38 caliber revolver during his Colorado stay and that appellant stated during their return trip to Wichita in appellant's automobile he, appellant, had a gun in the car trunk. The two arrived in Wichita December 19, 1973. The next day they met a girl called "Silky" whose real name was either Diana Warren or Dianna Coleman. The three spent much of the day together drinking gin. Silky was to commence working that night as a topless dancer in a club in Wichita called the Goldigger's Lounge. She displayed a .22 caliber pistol which she was carrying in her purse and said she had another gun hidden at the club and that both guns were for her protection. There were generally from seven to ten girls at the club who worked as dancers, some of whom doubled as well as prostitutes.

At the club that evening appellant told his friend Davis that he had a gun but Davis did not see him with one at any time during the afternoon or early evening. Late in the evening appellant intervened in an argument between the club bartender and the girl who was the manager of the dancers, offering to help the latter. At one point he commented, "If you're having some trouble I got a heater in my back pocket that will straighten it out".

The victim of the homicide, James Warren Hunter, arrived at the lounge about 10:30 p. m. During the evening he was seen talking to Silky and at one point fondled her breasts. At a time when Hunter paid five dollars to get some of the girls to pose for pictures the bartender noticed other currency in his billfold. Hunter, Davis and appellant remained in the lounge until closing time, which was 12:30 a. m. Outside the lounge appellant told Davis he was waiting to give Silky a ride home and that she was in a car in the parking lot. Davis assumed Silky was "turning a trick", Appellant and Silky had previously agreed appellant would pretend to be her husband and pull her from the car so that she would not actually have to have sexual relations with the man she was with. Appellant testified that after this agreement Silky handed him a .38 caliber revolver which she said was not loaded.

Appellant got out of his car and went to the other automobile in the parking lot. There were no lights on inside but the motor was running. Appellant tapped the back glass with the gun butt, Silky unlocked the door and appellant opened the passenger side door. Hunter and Silky were in the back seat. Silky got out of the car immediately, pulling on her pants and asking appellant to get her shoes. Appellant asked Hunter what he was doing with his "wife" and Hunter replied he had paid her. Hunter then pulled on his pants, turned the pockets partially inside out and said, "Hey, she got my money". Appellant testified he remembered saying, "No wonder she wanted me to play this little trick so she could steal somebody's money". Appellant further testified he then bent over to pick up Silky's shoes, he slipped in the snow, bumped into the door and the gun discharged. The bullet struck Hunter in the armpit beneath his right shoulder and penetrated the lung area, causing his death. Appellant's version was that the shooting was accidental and the only reason he took the gun was to scare Hunter with it.

After appellant returned to his car he told his friend Davis he had shot the victim in the chest. Davis had witnessed the shooting. As appellant left the area he took a cartridge out of the gun and threw it away. The next day appellant left for Denver and en route he threw the gun away. Silky vanished immediately after the shooting. In January, 1974, appellant was apprehended in Olathe, Kansas. Further evidence will be narrated in connection with the points at issue.

Appellant's principal point upon appeal is that the trial court erroneously denied his motions for acquittal and new trial because the offense of felonious possession of a firearm is not inherently dangerous to human life and therefore cannot be the basis for felony murder. K. S. A. 21-3401, under which appellant was convicted, provides:

*"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony. . . ."* (Emphasis supplied.)

Possession of a firearm with a barrel less than twelve inches long by a person who within five years has been released from imprisonment for a felony, is one form of unlawful possession of a firearm and is a class D felony (K. S. A. 21-4204 [1] [b] [2]).

Here there is no question that appellant within five years after

his release from confinement for a felony had in his hand a firearm with a barrel less than twelve inches long at a time when a bullet from that weapon caused Hunter's death. Appellant's argument is this. He says that to sustain a conviction for felony murder the collateral felony must be one inherently dangerous to human life; that this court recognized and applied this rule in *State v. Moffitt,* 199 Kan. 514, 431 P. 2d 879, and held that unlawful possession of a firearm by an ex-felon is inherently dangerous to human life as a matter of law, further that in reaching this conclusion in *Moffitt* we cited a line of California decisions holding that unlawful possession of a firearm constitutes a felony inherently dangerous to human life and, where causal connection is shown, a resulting homicide constitutes felony murder in the second degree under California law; that in 1971 the California supreme court receded from this position and in *People v. Satchell,* 6 Cal. 3d 28, 98 Cal. Reptr. 33, 489 P. 2d 1361, 50 ALR 3d 383, ruled that the unlawful possession of a firearm by a convicted felon, viewed in the abstract, is not a felony inherently dangerous to human life for purposes of the felony murder rule, and this court should similarly reverse its decision in *Moffitt* and so hold.

Appellee first responds that our present statute does not require that a felony be one inherently dangerous to human life in order to support a felony murder conviction. We cannot agree. At the time *Moffitt* was decided and prior to 1970, our felony murder statute (K. S. A. 21-401 [Corrick 1964]) provided:

*"Every murder* which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, or *which shall be committed in the perpetration or an attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree."* (Emphasis supplied.)

As a part of our new criminal code K. S. A. 1970 Supp. 21-3401 provided:

*"Murder in the first degree is the malicious killing of a human being* committed willfully, deliberately and with premeditation or *committed in the perpetration or attempt to perpetrate any felony."* (Emphasis supplied.)

Under the context of this statute it was possible to consider malice as a separate essential element of felony murder. In 1972, the statute was amended to its present form (Laws 1972, Chap. 112, § 1), as already quoted, to indicate that malice is not an essential element of felony murder, following *State v. Clark,* 204 Kan. 38, 460 P. 2d 586, in which we indicated that the effect of the felony murder rule

is to relieve the state of the burden of proving premeditation and malice when the victim's death is caused by the killer while he is committing another felony, the rationale being that the killer's malignant purpose is established by proof of the collateral felony.

In *Moffitt,* supra, we affirmed the rule that a homicide resulting from the commission of a felony inherently dangerous to human life constitutes felony murder or murder in the first degree. Although our statute has been twice amended since *Moffitt* we have adhered to the same ruling. In *State v. Bey,* 217 Kan. 251, 535 P. 2d 881, we said:

". . . [T]o support a conviction for felony murder all that is required is to prove that a felony was being committed which was inherently dangerous to human life, and that the homicide was a direct result of the commission of that felony." (Syl. para. 5.)

See also *State v. Reed,* 214 Kan. 562, 520 P. 2d 1314.

In *Moffitt* we were dealing with the "other felony" clause of the then felony murder statute and we concluded that to come within the clause such a felony must be one inherently dangerous to human life. Our present statute, and the one under which appellant is being prosecuted, uses the term "any felony". We see no significant distinction between the two expressions for purposes of determining the applicability of the felony murder rule and no reason to depart from the traditional requirement that the felony must be one inherently or foreseeably dangerous to human life. This limitation has always been imposed even in the absence of specific statutory mention and we adhere to that requirement. To go further could lead to manifestly unjust and even absurd results. In reaching the same conclusion the Delaware supreme court in *Jenkins v. State,* 230 A. 2d 262, commented:

". . . The only rational function of the felony-murder rule is to furnish an added deterrent to the perpetration of felonies which, by their nature or by the attendant circumstances, create a foreseeable risk of death. This function is not served by application of the rule to felonies not foreseeably dangerous. The rule should not be extended beyond its rational function. Moreover, application of the rule to felonies not foreseeably dangerous would be unsound analytically because there is no logical basis for imputing malice from the intent to commit a felony not dangerous to human life." (pp. 268-269.)

The next question is whether unlawful possession of a firearm by an ex-felon is an offense inherently dangerous to human life. In *Moffitt* we said that it was. In reaching this conclusion we did not specifically state whether we were viewing the felony in the abstract or, as several courts have done, were considering both the

nature of the felony and the circumstances of its commission (see cases cited in Anno.: Felony Murder—"Dangerous" Felonies, 50 ALR 3d 397, 405-408). In *Moffitt* the facts were that the defendant, a convicted felon, fired a pistol while assaulting two pedestrians and inadvertently killed a woman sitting on a motorcycle some distance down the street. We did comment in *Moffitt* upon legislative recognition that persons who had once committed a felony were dangerous to society and should not have in their possession concealable weapons. Beyond this, where doubt may exist, we see nothing wrong in considering both the nature of the offense in the abstract and the circumstances of its commission in determining whether a particular felony was inherently dangerous to human life. Some felonies, such as aggravated robbery, viewed in the abstract alone, are of such nature as to be inherently dangerous to human life, while another which seems of itself not to involve any element of human risk may be committed in such a dangerous manner as to be of the same character.

Hence we hold that the nature of the felony and, where necessary for determination, the circumstances of its commission are relevant factors in considering whether the particular felony was inherently and foreseeably dangerous to human life so as to support a conviction of felony murder. These are questions for the trial court and jury to decide in appropriate cases. In the case at bar appellant's own testimony was that he used the pistol to scare the victim. However, there was no evidence he made any presentment of the pistol in an offer to do corporal hurt to the victim so as to amount to an assault constituting an integral part of a murder charge as prohibited by *State v. Clark*, 204 Kan. 38, 460 P. 2d 586. Under appellant's undisputed admissions the trial court in effect correctly held as a matter of law that the collateral felony, unlawful possession of a firearm, was a sufficient basis for application of the felony murder rule. In reaching a contrary result the California court in *People v. Satchell*, supra, declined to take into account the particular circumstances of the collateral felony, a rigid position we decline to adopt.

Appellant makes the further broad assertion that application of the felony murder rule in his case constitutes the infliction of cruel and unusual punishment and denial of his rights of equal protection and due process. The felony murder rule represents a long standing policy of this state. We have already indicated its rationale —to furnish an added deterrent to the perpetration of felonies

which, by their nature or the attendant circumstances, create a foreseeable risk of death. "The legislature, acting in the exercise of the police power of the state, is empowered to enact measures in furtherance of the public welfare and safety, and its enactments in such areas are not to be judicially curtailed where they reasonably relate to the ends sought to be attained. Classification honestly designed to protect the public from evils which might otherwise arise are to be upheld unless they are unreasonable, arbitrary or oppressive" (*State v. Weathers*, 205 Kan. 329, Syl. para. 1 & 2, 469 P. 2d 292). The felony murder rule, designed as it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible.

Appellant next contends the trial court abused its discretion in admitting into evidence several photographs of the deceased taken during the course of an autopsy, since he did not seriously contest the fact or cause of death during the trial. The pathologist who performed the autopsy used the challenged photographs in connection with his trial testimony. He testified to, and with the aid of the postmortem pictures demonstrated, the grazing effect of the bullet wound indicating that the right arm of the victim was raised parallel with the shoulder and extended toward the front when the bullet entered the body, and more importantly, the downward path of the bullet through the victim's body, thus contradicting appellant's testimony that the gun discharged when he fell backwards next to the automobile. Under these circumstances the photographs were relevant to illustrate and substantiate the pathologist's testimony and appellant suffered no prejudice in their admission. They were not of the shocking and repetitive nature condemned in *State v. Boyd*, 216 Kan. 373, 532 P. 2d 1064. We recently stated the applicable rule in *State v. Sully*, 219 Kan. 222, 547 P. 2d 344:

"The admission of photographs of a decedent, including photographs taken during an autopsy, is not error where the photographs are relevant to matters in issue, such as the fact and manner of death or to assist in understanding a pathologist's testimony. Photographs, if relevant and material to matters in issue, are not rendered inadmissible merely because they may be shocking or gruesome." (Syl. para. 2.)

Appellant contends the trial court erred with respect to its instruction on possession of a firearm. The fact of appellant's earlier conviction of that offense was not, of course, made known to the

jury in the instant case. Appellant's principal target is instruction No. 4, which stated:

"Possession means dominion or control, exclusive or joint, temporary or permanent, over the revolver, that is to say, possession of a firearm within the contemplation of the statute is the exercise of dominion thereof."

Instruction No. 5 stated:

"You are further instructed that the laws of the State of Kansas provide that it shall be unlawful for a person knowingly having in his possession a firearm with a barrel less than twelve (12) inches long within five years after being released from imprisonment for a felony. Forcible rape is a felony."

Appellant's trial counsel had this to say on the subject:

"Like to have an Instruction on difference between possession and custody to the effect that there is a difference between the terms custody and possession. Possession is a present right and power to control a thing. A person has the cutody of property as distinguished from possession where he merely has the care of it or one who retains the right to control it and, therefore, retains constructive possession. Like to have that Instruction.

. . . . . . . . . . . . . .

"I object to that instruction, [No. 4] and again reinstate my original instruction on difference between possession as opposed to custody as I read to the Court yesterday."

Appellant also submitted two written requested instructions as follows:

" 'Custody' and 'possession' are distinguished in that delivery of goods may give mere 'custody' thereof while technical possession remains in one delivering the goods.

"Possession and custody are not convertible terms. To constitute possession mere temporary custody is not sufficient."

It should be borne in mind that determination of the sufficiency or adequacy of jury instructions may in a given case depend upon the particular evidence adduced in that case.

Appellant now seeks to come within the ambit of our ruling in *State v. Neal,* 215 Kan. 737, 529 P. 2d 114. There the trial court instructed the jury that to establish the charge it had to be proved the defendant knowingly had possession of a firearm but the court did not define the term possession or instruct the jury as to the intent with which the firearm had to be possessed, *i. e.,* to control its management and use. We held these omissions were, under the particular circumstances, reversible error. The defendant had purchased from a pawnshop, and immediately turned over to his girl friend for her protection in her home, a firearm of a type proscribed to the ex-felon. The gun was placed in the girl friend's bedroom

closet and thereafter remained untouched by defendant until he cleaned it and with the girl friend took it back to the pawnshop for pawning. After reviewing two of our earlier decisions we concluded:

"When taken together, *Phinis* and *Runnels* [*State v. Phinis*, 199 Kan. 472, 430 P. 2d 251, and *State v. Runnels*, 203 Kan. 513, 456 P. 2d 16] fashion the rule that the possession proscribed by the statute is not the innocent handling of the weapon but a willful or knowing possession with the intent to control the use and management thereof. This definition accords with that contained in PIK Criminal, chapter 53.00, Definitions and Explanations of Terms, p. 69:

" '*Possession:* Having control over a place or thing with knowledge of and the intent to have such control. *State v. Metz*, 107 Kan. 593, 193 P. 177 (1920); *City of Hutchinson v. Weems*, 173 Kan. 452, 249 P. 2d 633 (1952). . . .' " (p. 740.)

Several of our cases have spoken in terms of "dominion" and "control" of a firearm in defining the concept of possession. In *State v. Porter*, 201 Kan. 778, 443 P. 2d 360, cert. den. 393 U. S. 1108, 21 L. ed. 2d 805, 89 S. Ct. 919, the court held:

"The possession and control of a pistol contemplated by K. S. A. 21-2611 [the prior statute] is the exercise of dominion thereover, or the right and authority to possess, control and manage its use and disposition." (Syl. para. 3.)

In *State v. Knowles*, 209 Kan. 676, 498 P. 2d 40, we held that both the "possession" of a firearm under K. S. A. 21-4204 (1) (*b*) and "control" of property under the theft statute, K. S. A. 21-3701, connote the exercise of "dominion" over the property in question (Syl. para. 1).

The real question here is whether the instructions adequately covered the subject. We think they did. Although they might have been more precisely worded they did define possession in terms of dominion and control, which was sufficient. The facts in *Neal* are clearly distinquishable from those here. There the defendant's only handling of the gun was in procuring it from the pawnship and immediately turning it over to his girl friend waiting outside in an automobile and in cleaning and returning it with her to the pawn shop. There was no evidence he in any way attempted to use or control the gun as a weapon. Here appellant's own admissions show he did more than exert mere "custody" over the pistol. Most importantly, he testified he used the gun to scare the victim—certainly this use as a weapon was more than the mere innocent handling or the casual, fleeting or momentary possession referred to in some of our prior cases. Appellant's argument that the jury could have found that Silky owned the gun and therefore

controlled it at the time of the victim's death equates ownership and control and is fallacious because in cases of unlawful possession of a firearm ownership of the weapon is not an essential element of the offense and may even be immaterial (*State v. Phinis*, supra; *State v. Potts*, 205 Kan. 42, 468 P. 2d 74).

Appellant further contends the trial court erred in refusing to suppress a taped oral confession given by him because it was not voluntarily made and was taken prior to his appearance before a magistrate. Appellant was arrested in Olathe, Kansas, late Sunday evening, January 6, 1974, upon a charge of siphoning gasoline. His giving of a fictitious name and address aroused police suspicion with the consequence an identity check revealed he was wanted in Wichita on a murder charge. He was transported by police to Wichita early Monday morning, January 7, 1974, and the taped confession was made early in the afternoon of the same day. His first appearance before a magistrate was on Tuesday, January 8, 1974.

When appellant was first arrested in Olathe for siphoning gas the arresting officer immediately advised him of his constitutional rights. He was then taken to the police station where he was interviewed by a detective after a second advising of rights. When this detective discovered appellant's true identity and that he was wanted in Wichita for murder he arrested him upon that charge and again advised him of his constitutional rights. On that occasion he handed appellant a printed form entitled "Your Rights", which contained the *Miranda* statement of rights and provided a space for their written waiver. Appellant read the form and signed the waiver. He then told the officers he had killed a man in the parking lot of the Goldigger's Lounge in Wichita with a .38 caliber gun.

Three law officers from Wichita arrived at the Olathe jail at about 5:45 a. m. Monday, January 8th. They again advised appellant of his constitutional rights and conversed with him for about six minutes. During this interview appellant stated he had killed a man in Wichita but the shooting was accidental. Appellant then agreed he would make a recorded statement when they returned to Wichita. During the return trip the officers did not discuss the case with appellant and he was free to sleep in the car. Appellant made no request for food during the trip but was given coffee and a cupcake at a rest stop.

The officers and appellant arrived at the Sedgwick county court-

house at 11:15 a. m., January 7th. Appellant was fingerprinted and booked into jail and then taken to a detective's office where he made a tape recorded statement beginning at 12:19 p. m. of the same day. Before the statement was taken appellant was again advised of his constitutional rights and in his taped statement he acknowledged he had been informed of those rights and had waived them.

Appellant contends his taped confession was not voluntary for a number of reasons: He had only a sixth grade education; he had been drinking heavily and going without food for two or three days prior to his arrest; he was not given adequate nourishment during detention before the statement was made; he did not have adequate rest the night before the recording was taken, and he signed the waiver form because the officers were asking him questions so fast he did not understand them and he believed signing the form would stop the questions.

In a criminal proceeding a statement made by an accused constituting a confession of guilt to the crime charged is not admissible in evidence unless it appears the confession was made freely and voluntarily and not under compulsion of duress (*State v. McVeigh*, 213 Kan. 432, 516 P. 2d 918). In *State v. Soverns*, 215 Kan. 775, 529 P. 2d 181, we had this to say on custodial interrogation:

". . . If such confession is made while the accused is under restraint by law enforcement officials, evidence of the confession is not admissible on the trial, unless it is made to clearly appear that the accused was fully advised of his constitutional rights, and after being so advised, the confession of guilt was freely and voluntarily made under circumstances that afforded no undue influence in procuring the confession. [Citations]

"Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. [Citation] In determining the admissibility of a statement of the defendant obtained during custodial interrogation the trial court must weigh any conflicting evidence and make its findings based on the totality of the circumstances. If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly and intelligently waived his Fifth and Six Amendment rights, such findings will not be disturbed on appellate review. . . ." (p. 777.)

In *State v. Creekmore*, 208 Kan. 933, 495 P. 2d 96, we commented:

". . . Factors generally considered as bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation;

the ability of the accused on request to communicate with the outside world; the accused's age, intellect and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. Generally if the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary." (p. 934.)

"The mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact" (*State v. Brunner,* 211 Kan. 596, Syl. para. 5, 507 P. 2d 233).

It is the duty of the trial court upon a motion to suppress to determine, in the first instance, whether a confession has been made voluntarily and without compulsion or coercion and the burden of proving voluntariness is on the state (K. S. A. 22-3215). "When a trial court, pursuant to the provisions of K. S. A. 22-3215, conducts a preliminary inquiry on the admissibility of an extrajudicial statement given by an accused, and determines the statement was freely, voluntarily and intelligently given and admits the statement into evidence at the trial, this court on appellate review will accept such determination if it is supported by substantial competent evidence" (*State v. Smith,* 216 Kan. 265, Syl. para. 1, 530 P. 2d 1215).

The trial court held an out-of-court *Jackson-Denno* type hearing on appellant's motion to suppress his taped statement and concluded it was voluntarily given and admissible. Under the totality of the circumstances that decision is supported by substantial competent evidence. Appellant was fully advised of his rights on five different occasions, by three different officers and in various settings. In each instance appellant evinced his understanding of his rights and his willingness to make a statement. There is no claim or indication of police cajolement or harassment in order to break appellant's will and no attempt by him at any time to break off questioning. The arresting officer saw no indication of alcohol or drugs in connection with appellant. The detective who first confronted appellant with the murder charge testified he did not believe appellant was under the influence of alcohol or drugs; that there was no impairment of speech or walking ability and no signs of mental incapacity. Other officers testified he talked freely, understandingly, and without any compulsion or promises of any kind. Although he did not get much sleep the night of his arrest, he was allowed to rest in the car on the trip to Wichita. He

may have missed one full meal in the interim but it appears more nourishment would have been given upon his request. In *State v. Law*, 214 Kan. 643, 522 P. 2d 320, we considered the evidence under which an incriminating statement was given and rejected a contention of involuntariness based upon the defendant's assertion he signed a waiver of rights in order to stop the questioning.

What about the delay factor in appellant's appearance before a magistrate? He was arrested late Sunday evening in Olathe, transported to Wichita early the next morning, gave the taped statement early the next afternoon and first appeared before a magistrate the following day. He asserts the delay was unreasonable and prejudicial because the statement was given meanwhile. K. S. A. 22-2901 mandates that after arrest an accused be taken before a magistrate "without unnecessary delay". The purpose of the statute is to insure that the person arrested is held on a proper charge and to secure to such person the earliest possible opportunity for bail (*State v. Nading*, 214 Kan. 249, 252, 519 P. 2d 714).

Although this court disapproves of any unwarranted delay in taking a prisoner before a magistrate after he has been arrested, delay in itself is not a denial of due process unless it has in some way prejudiced the right of the accused to a fair trial (*State v. Giddings*, 216 Kan. 14, Syl. para. 5, 531 P. 2d 445). Whether a delay is unreasonable or prejudicial must depend on the facts and circumstances of each case.

This court has ruled that delays of six days (*Underwood v. State*, 214 Kan. 633, 522 P. 2d 457), thirteen days (*Cooper v. State*, 196 Kan. 421, 411 P. 2d 652) and two days over a weekend (*State v. Nading*, supra) were not prejudicial. In the case at bar the delay was actually less than one day after appellant was brought to Wichita. The challenged statement was made prior to his appearance before a magistrate. However, this taped statement, except for elaboration as to details, was essentially the same as he had twice given at Olathe—first to the Olathe detective when he was arrested for murder and again a few hours later to Sedgwick county officers at the Olathe jail, and against which no challenge has been made. Appellant seemed completely willing at all times to discuss the affair and in view of the repeated warnings of *Miranda* rights there is no reason to believe that an earlier appearance before a magistrate would have changed his willingness. A very similar argument on this score was made and rejected in *State v. Law*, supra,

where the trial court excluded testimony that the defendant had not been taken before a magistrate until after he had given two written confessions and had been in custody for over thirty-three hours. In upholding the trial court we said:

"This court has held that a confession obtained during a period of illegal detention is not inadmissible if voluntarily made and not the product of the detention. [Citations] Needless to say, we do not approve of unwarranted delay in taking a suspect before a proper magistrate; however, any issue as to whether defendant's confessions were freely and voluntarily made or a product of the delay in taking him before a magistrate was resolved by the trial court." (pp. 650-651.)

No prejudice has been shown by the delay and under all the circumstances the trial court did not err in admitting appellant's statement into evidence.

Appellant next contends the trial court erred in refusing to instruct the jury on the lesser included offenses of second degree murder and involuntary manslaughter. In *State v. Reed*, 214 Kan. 562, 520 P. 2d 1314, we noted that a trial court's duty under K. S. A. 21-3107 (3) to instruct on a lesser included offense arises only where there is evidence under which the defendant might reasonably have been convicted of the lesser offense. As already indicated, under the felony murder rule the felonious conduct itself is held tantamount to the elements of malice, deliberation and premeditation which are otherwise required for first degree murder, and if proof is adduced during the trial that the accused was committing a felony inherently dangerous to human life and the homicide was a direct result of that felony, then the only possible conviction can be that of first degree murder under the felony murder rule (*State v. Reed,* supra, and *State v. Masqua,* 210 Kan. 419, 502 P. 2d 728). The cases of *Reed* and *Masqua* were distinguished, however, in the recent case of *State v. Bradford,* 219 Kan. 336, 548 P. 2d 812. There this court upheld a trial court's decision to instruct the jury on the lesser included offense of second degree murder even though the defendant was charged with felony murder. The court's rationale was as follows:

"The circumstances of this case are distinguishable from those in *Reed* and *Masqua.* In those cases the evidence was uncontradicted that a felony had occurred. There was no conflicting testimony. This court therefore held that because the jury could not have found *Reed* and *Masqua* not guilty of the felonies with which they were charged, and yet guilty of the murder charged, instructions on lesser degrees of homicide were inappropriate.

"In the case at hand, conflicting evidence was presented as to whether or not the felony charged, robbery, had occurred. . . .

"Ordinarily, in a felony murder case, where the evidence of the commission of the felony is clear and uncontroverted, no instruction on lesser degrees of homicide should be given. But where, as here, there is conflicting evidence as to the commission of the felony, and where the evidence will support a conviction of a lesser degree of homicide, instructions on appropriate lesser degrees should be given." (pp. 342-343.)

Was the evidence in the case at bar clear and undisputed that the appellant committed the felony of unlawful possession of a firearm, and that during the commission of that felony the homicide was committed? Much of that which has already been said supplies an affirmative answer to this question. Appellant's own testimony was that he used the pistol to scare the victim and all the evidence compels the conclusion he did in fact use the pistol in a menacing fashion as a weapon even though its discharge may have been accidental. Under these uncontroverted facts instructions on any lesser degree of homicide would have been improper.

Finally, appellant complains of the trial court's failure to permit the jury to fix the punishment to be assessed upon conviction. Instead the court fixed the punishment as life imprisonment. Murder in the first degree is a class A felony. K. S. A. 21-4501 provides:

"For the purpose of sentencing, the following classes of felonies and terms of imprisonment authorized for each class are established:

"(a) Class A the sentence for which shall be death or imprisonment for life. If there is a jury trial the jury shall determine which punishment shall be inflicted. . . ."

The complaint has no merit. At the time of appellant's trial the death penalty in Kansas had been judicially abolished and a jury in a class A felony case no longer had any function or choice to perform in fixing the penalty upon conviction (*State v. Randol*, 212 Kan. 461, 513 P. 2d 248). The law fixed the only permissible punishment and its declaration was a matter for the trial court.

The judgment is affirmed.

APPROVED BY THE COURT.

KAUL, J., (concurring): I concur with the majority's disposition of this appeal, but feel compelled to record these observations. In *State v. Moffitt*, 199 Kan. 514, 431 P. 2d 879, a unanimous court firmly established that possession of a pistol after a felony conviction in violation of K. S. A. 21-2611 constituted a felony inherently dangerous to human life. In *Moffitt*, we held:

"The term 'other felony' in K. S. A. 21-401 includes the felony created by K. S. A. 21-2611 (possession of a pistol after conviction of a felony) *which*

*is held to be inherently dangerous to human life,* and where the evidence discloses a direct causal relation between the commission of such felony and the homicide, it is sufficient to sustain a conviction on a charge of murder in the first degree, even though intent is not an element of proof in K. S. A. 21-2611." (Syl. 6.) (Emphasis supplied.)

The gist of our holding in *Moffitt,* concerning the application of the felony-murder rule, was reaffirmed by a unanimous court in *State v. Bey,* 217 Kan. 251, 535 P. 2d 881.

*Moffitt* was decided in 1967. I think it may be said, without dispute, that it is a matter of common knowledge that firearm homicides, committed by felons, have dramatically increased even since the *Moffitt* decision. Our legislature has examined our criminal code on several occasions and found no reason to alter the *Moffitt* rule. Under the circumstances, it appears to me, that modification or reversal of our unanimous decision in *Moffitt* would be a grave mistake.

PRAGER, J., dissenting: I respectfully dissent from that portion of the majority opinion which holds that mere possession of a firearm contrary to K. S. A. 21-4204 (1) (*b*) may be used to convert an accidental or nonmalicious killing to murder in the first degree by application of the felony-murder rule. In the typical murder case in order for a defendant to be convicted of murder in the first degree it is incumbent upon the state to prove that the defendant killed his victim maliciously, willfully, and with deliberation and premeditation. Murder in the first degree is punishable by life imprisonment under our present statute. The majority opinion correctly points out that the felony-murder rule was designed to relieve the state of the burden of proving willfulness, premeditation, deliberation, and malice when the victim's death is caused by the killer while he is committing another felony. The rationale behind the felony-murder rule is that the killer's malignant purpose is established by proof of the collateral felony. The majority opinion correctly declares that all felonies are not sufficient to permit the application of the felony-murder rule. In order for the felony-murder rule to be applicable, the collateral felony must be one inherently or forseeably dangerous to human life, and to sustain a conviction for murder in the first degree under that rule, it must be shown that the homicide committed was a direct causal result of the commission of such felony. At this point I am in complete agreement with the majority.

The basic issue presented in this case is whether or not the mere unlawful possession of a firearm by a convicted felon contrary to K. S. A. 21-4204 (1) (*b*) is the type of felony which reasonably permits the application of the felony-murder rule to a killing which is accidental or nonmalicious. I wish to emphasize in the beginning that the offense of unlawful possession of a firearm by a convicted felon is an important part of our criminal code. K. S. A. 21-4204 (1) (*b*) provides in substance that possession of a firearm with a barrel less than twelve-inches long by a person who, within five years preceding such violation has been convicted of a felony under the laws of Kansas or any other jurisdiction or has been released from prison for a felony is a class D felony which under our penal code is punishable by confinement in a penal institution for a variable minimum term of not less than one year nor more than three years and a maximum term of ten years. The law is well designed to protect the public from the improper use of firearms by convicted felons. The majority opinion appears to concede that unlawful possession of a firearm in violation of K. S. A. 21-4204 in the abstract is not an inherently or foreseeably dangerous act unless the circumstances of its commission make it so. Such a rule is logically based upon the assumption that it is not the possession of the firearm which is inherently dangerous but it is rather the handling or the *use* which is made of the firearm which may be inherently dangerous so as to justify the application of the felony-murder rule.

The issue before us in this case was determined by the Supreme Court of California in 1971 in *People v. Satchell,* 6 C. 3d 28, 98 Cal. Rptr. 33, 489 P. 2d 1361, 50 A. L. R. 3d 383. In that case the California court pointed out that the felony-murder rule is a highly artificial concept and warned that "it should not be extended beyond any rational function that it is designed to serve." The court further held that the determination as to whether a felony is inherently dangerous for purposes of the felony-murder rule must be based upon an assessment of that felony in the abstract and not on the particular facts of a case. It concluded that neither possession of a concealable firearm by a person who has previously been convicted of a felony nor possession by any person of a weapon such as a sawed-off shotgun is a felony inherently dangerous to human life for purposes of the felony-murder rule. It concluded that a person who perpetrates a homicide while engaged merely in the commission of the felony of possession of a firearm may not be convicted of murder unless the existence of the crucial mental state

of malice aforethought is actually proved by the prosecution. It is important that we examine closely the rationale of the California court in *Satchell* where the court stated:

"It is manifest that the range of antisocial activities which are criminally punishable as felonies in this state is very wide indeed. Some of these felonies, such as certain well-known crimes against the person of another, distinctly manifest a propensity for acts dangerous to human life on the part of the perpetrator. Others . . . just as distinctly fail to manifest such a propensity. Surely it cannot be said that a person who has committed a crime in this latter category, when he arms himself with a concealable weapon, presents a danger to human life so significantly more extreme than that presented by a non-felon similarly armed as to justify the imputation of malice to him if a homicide should result. Accordingly, because we can conceive of such a vast number of situations wherein it would be grossly illogical to impute malice, we must conclude that the violation of section 12021 by one previously convicted of a felony is not itself a felony *inherently* dangerous to human life which will support a second degree felony-murder instruction." (pp. 40-41.)

The California court recognized that possession of a firearm is a passive act which in and of itself, is not inherently dangerous. The weapon becomes inherently dangerous when it is *used* in such a manner as to endanger a human life. The California court in its opinion stated as follows in this regard:

"Viewing the matter from the standpoint of inherent danger, we find it difficult to understnad how any offense of mere passive possession can be considered to supply the element of malice in a murder prosecution. To be sure, if such possession is of an extremely reckless nature manifesting a conscious disregard for human life, malice may be imputed by means of basic murder principles. . . . Moreover, if passive possession ripens into a felonious *act* in which danger to human life is inherent, the purpose of the felony-murder rule is served by its application—for it is the deterrence of such acts by felons which the rule is designed to accomplish. However, mere possession *in itself*—ignoring the propensities and conduct of the possessor—is essentially neutral in its intentional aspect and should not serve as the basis for the imputation of malice." (pp. 42-43.)

The rule adopted by the majority in the case before us is not sound for several reasons. In the first place, in my judgment, it is a rule which would be impossible for the trial courts of this state to apply. The majority opinion states that where doubt exists as to whether in a particular case unlawful possession of a firearm is inherently dangerous, there is nothing wrong in considering both the nature of the offense in the abstract and the circumstances of its commission in determining whether the offense was inherently dangerous to human life in the particular case. The majority opinion has furnished no guidelines to assist the trial court in in-

structing the jury. This in my judgment places a difficult burden upon the district courts of this state in applying the rule adopted by the majority.

The rule of the majority opinion also may result in a serious conflict with the established principle of law that in a first-degree murder prosecution the felony-murder rule may not properly be invoked when it is based upon a felony which is an integral part of the homicide. ( *State v. Clark,* 204 Kan. 38, 460 P. 2d 586; *State v. Fisher,* 120 Kan. 226, 243 Pac. 291.) The rule followed by the majority requires the trial court and the jury to consider not only the unlawful possession of a pistol in the abstract but also the manner in which the pistol is handled or used in determining whether the possession was inherently dangerous to human life. In the case now before us the majority relies upon the fact that the defendant had a gun in his hand in order to scare the deceased and thereby to coerce him into involuntary action. In order to avoid a conflict with the rule of *State v. Clark,* supra, the majority opinion emphasizes that there was no evidence the defendant made any presentment of the pistol in an offer to do corporeal hurt to the victim so as to amount to an assault constituting an integral part of the murder charge as prohibited by *Clark.* The clear implication is that if the defendant had actually assaulted the deceased with a gun, then the felony-murder rule would not have been applicable since in that situation the assault would have been an integral part of the homicide. It would seem to follow that if a defendant unlawfully possessing a firearm does not commit an assault upon his victim but accidentally kills him, then he may be found guilty of felony-murder. If, however, he assaults his victim then the felony-murder rule cannot be applied and in order to convict the defendant of murder the state must prove that the defendant intentionally and with malice committed the homicide. The irrationality of this distinction is obvious on its face.

Furthermore, I wish to point out that the practical application of the rule approved by the majority can produce other absurd results. For example, let us assume that a defendant, having been previously convicted of felony for writing an insufficient fund check, purchases a firearm to protect himself and his family against criminal invaders of his home. He accidentally drops the gun, causing it to strike the floor and be discharged, killing a guest in his home. Since the killing occurred during commission of a felony, possession of the gun unlawfully, defendant would be precluded from inter-

posing the defense of accident. Under the rule adopted by the majority defendant would be guilty of murder in the first degree and possibly subjected to a term of life imprisonment in the state penitentiary.

Another example—a farm lad served in the Vietnam war and at the time of his discharge obtained an automatic rifle which he took to his farm home. He wanted the gun not only for the protection of himself and his family but also for use in the killing of predators that might attack his livestock. Under the provisions of K. S. A. 21-4201 (1) (g) it is a class E felony for any person to possess a firearm capable of discharging automatically more than once by a single function of the trigger. An intruder comes upon the defendant's farm. The defendant points a gun at the intruder, directing him to get off his place. The gun accidentally discharges and kills the intruder. The rule adopted by the majority in this case would require the jury to convict the defendant of murder in the first degree since at the time of the killing the defendant was committing another felony—possession of an automatic weapon—at the time the killing took place.

One more example should suffice. A defendant having been previously convicted of a felony accidentally shoots another person. At the time defendant was in possession of a firearm with a barrel eleven-inches long. Applying the felony-murder rule the defendant would be guilty of felony murder and upon conviction a life sentence would be imposed. If the firearm involved in the case had a barrel twelve-inches long the defendant would not be guilty of any criminal offense since the shooting was accidental and would fall into the category of an excusable homicide. It does not seem reasonable to impute malice to the defendant in the first situation and not to do so in the second situation; yet this absurd result would follow under the rule adopted by the majority of the court in this case.

I have pointed out these examples to show how irrational it is to use the unlawful possession of a firearm as a basis for application of the felony-murder rule. I want to emphasize the fact that the California rule does not prevent prosecution for murder in cases such as the one now before us. *People v. Satchell,* supra, merely holds that malice may not be imputed from the passive act of possession of a weapon. The state may properly prove the basic elements of premeditated murder where the evidence establishes that the firearm was used by the convicted felon in such a manner

Assuming that the rule of the majority should be adopted, it would still be necessary to reverse this case and grant the defendant a new trial. As pointed out above the majority has taken the position that felony possession of a firearm in the abstract is not sufficient to justify the application of the felony-murder doctrine. For the felony-murder rule to be applied the possession of the firearm must be under such circumstances as to be inherently dangerous to human life. The majority rule would, of necessity, require an instruction to the jury that before the felony-murder rule should be applied it must find that the factual circumstances of the case made felony possession an inherently dangerous crime. Absent such a qualifying instruction the jury would be permitted to use a passive nondangerous type of possession of the firearm as a sufficient basis to find the defendant guilty of felony murder. In this case the jury was instructed without qualification that if the defendant killed the deceased and if such killing was done in the commission of the felony of unlawful possession of a firearm he should be found guilty of murder in the first degree. They were not instructed to take into consideration the factual circumstances present in the case. Even the majority would appear opposed to this result.

I further disagree with the majority opinion for the reason that in my judgment under the evidence presented in the case the defendant was entitled to an instruction on lesser included offenses of homicide. The testimony offered by the defendant tended to show the shooting was accidental as a result of his slipping in the snow, bumping into the door and causing the gun to be discharged. The defendant testified that he had just received possession of the gun from Silky who said it was not loaded and that his only purpose in taking the gun was to scare the man with it. Such evidence negates the presence of a willful and malicious killing and the premeditation necessary to prove murder in the first degree. In my judgment it was error for the trial court in this case to instruct the jury on the theory of felony murder rather than premeditated murder and in its failure to instruct the jury on lesser included offenses which were justified under the evidence and the theory of the defense.

In view of the position that has been taken in this dissent, it would logically follow that *State v. Moffitt*, 199 Kan. 514, 431 P. 2d

879, should be overruled. *Moffitt* relies to a great extent on *People v. Ford,* 60 C. 2d 772, 36 Cal. Rptr. 620, 388 P. 2d 892; *People v. Williams,* 63 C. 2d 452, 47 Cal. Rptr. 7, 406 P. 2d 647; and *People v. Robillard,* 55 C. 2d 88,10 Cal. Rptr. 167, 358 P. 2d 295, 83 A. L. R. 2d 1086. Those California cases held that unlawful possession of a pistol by a convicted felon was capable of supporting a felony-murder instruction. The rationale of those cases was considered and rejected by the California Supreme Court in *People v. Satchell,* supra. *Moffitt* should be overruled by this court not only for the reason that it relied upon California decisions which are no longer the law but also because the basic rationale of the case is not legally sound and is inherently unjust.

For the reasons set forth above I would reverse this case with directions that a new trial be granted.

FROMME and OWSLEY, JJ., join in the foregoing dissenting opinion.