No. 85,621

STATE OF KANSAS, *Appellee*, v. RANDY D. OWENS, *Appellant*.

(35 P.3d 791)

Opinion filed December 7, 2001.

*Peter T. Maharry*, assistant appellate defender, argued the cause, and *Brent Getty*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Brandon L. Jones*, assistant county attorney, argued the cause, and *John R. Dowell*, county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, C.J.: Randy D. Owens appeals his jury trial conviction of one count of involuntary manslaughter (K.S.A. 2000 Supp. 21-3404) and one count of criminal possession of a firearm (K.S.A. 2000 Supp. 21-4204[a][3]). Defendant was sentenced to 122 months and 9 months, respectively, with the sentences running concurrently. The victim in this case was defendant's brother, Jeremy Owens.

## FACTS

The tragic events herein occurred on July 7, 1998, at the rural Franklin County residence of the grandmother of defendant and his brother Jeremy Owens. Jeremy was the owner of a .38 caliber revolver and received a gunshot in the chest from the gun. The first responder to the 911 call was Sheriff Deputy Woods who was advised by defendant that the gun had accidentally fired while Jer-

emy was cleaning it. The victim was transported to a Topeka hospital where he died later that day. Deputy Woods had a question about whether or not the gunshot was self-inflicted and asked the Kansas Bureau of Investigation for assistance.

Defendant was interviewed by KBI Special Agent Raymond Lundean at the hospital. Initially, defendant advised the agent that Jeremy was on the front porch of the residence trying to open the gun's cylinder when the defendant bumped him in the back with the door as defendant stepped onto the porch. The gun discharged. Later in the interview, the agent asked defendant exactly how the shooting occurred as an autopsy would reveal additional information. When Agent Lundean asked if the shooting could have occurred in any other way, defendant became visibly upset, began to cry, and told the agent that he had the gun in his hand and that he had killed his brother. Defendant said Jeremy had been on the porch attempting to get the cylinder open when defendant walked out. Jeremy handed defendant the gun and stepped off the porch. Defendant remained on the porch, held the gun at waist height, and tried to force the cylinder open. While he was doing so, the gun discharged. Defendant said he did not even remember if he had his finger on the trigger. Defendant said the bullet entered Jeremy's body and Jeremy began to move toward his aunt's house next door when he collapsed. Defendant showed Agent Lundean how Jeremy was standing in relation to the defendant when the shooting occurred. Agent Lundean testified that he believed this was more consistent with the path of the bullet and the injury he observed at the hospital.

Agent Lundean further testified that defendant told him that he, the defendant, had shot the gun at some cans earlier in the day.

Forensic pathologist Dr. Eric Mitchell performed the autopsy and testified that the bullet passed through Jeremy's lungs and heart and its path was not consistent with a self-inflicted gunshot wound.

Defendant testified that Jeremy handed him the gun for help in unjamming it. Defendant further testified that he was able to turn the cylinder and that, upon seeing this, Jeremy reached for the gun and it discharged. Defendant testified that he had initially given

false information as to how the shooting had occurred because he had previously been convicted of a felony and knew he should not possess the gun.

Defendant stipulated that he had been convicted of aggravated assault in 1996.

## ISSUES

On appeal defendant raises two issues:

1. For purposes of defendant's conviction on count i, is criminal possession of a firearm a status crime or was it enacted for the protection of human life or safety?

2. Did the district court err in failing to give a unanimity instruction on count ii, criminal possession of a firearm?

We turn now to our analysis of these issues.

## INVOLUNTARY MANSLAUGHTER CONVICTION

Defendant argues that the underlying crime, criminal possession of a firearm, does not support a charge of involuntary manslaughter and the district court erred in denying defendant's motion to dismiss that charge.

The State disagrees with defendant's argument but agrees that this court must interpret whether prohibiting felons from possessing a firearm is a statute enacted for the purpose of protecting human life and safety.

Interpretation of a statute is a question of law over which this court's review is unlimited. *State v. Lewis*, 263 Kan. 843, 847, 953 P.2d 1016 (1998).

Criminal statutes must be strictly construed in favor of the accused. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute. The rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Vega-Fuentes*, 264 Kan. 10, 14, 955 P.2d 1235 (1998).

K.S.A. 2000 Supp. 21-3404 provides:

"Involuntary manslaughter is the unintentional killing of a human being committed:
"(a) Recklessly;

"(b) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and 8-1568 and amendments thereto but excluding the acts described in K.S.A. 8-1567 and amendments thereto; or

"(c) during the commission of a lawful act in an unlawful manner.

"Involuntary manslaughter is a severity level 5 person felony."

In count I, defendant was charged pursuant to K.S.A. 2000 Supp. 21-3404(b) in the following language:

"That on or about the 7th day of July, 1998, the above-named Defendant, within the above-named County, in the State of Kansas, then and there being, unintentionally kill a human being, to-wit: Jeremy R. Owens, while in the commission of Felon in Possession of a Firearm, a violation of K.S.A. 21-4204, in violation of K.S.A. 21-3404(b), **Involuntary Manslaughter**, a severity level 5, person felony."

(NOTE: Throughout the pleadings herein, the crime of criminal possession of a firearm is referred to as felon in possession of a firearm.)

Criminal possession of a firearm (K.S.A. 2000 Supp. 21-4204[a][3]), under which defendant was charged in count II and which was used as the underlying felony in count I, provides in part:

"(a) Criminal possession of a firearm is:

. . . .

"(3) possession of any firearm by a person who, within the preceding five years has been has been convicted of a felony, other than those specified in subsection (a)(4)(A), under the laws of Kansas or a crime under a law of another jurisdiction which is substantially the same as such felony, has been released from imprisonment for a felony or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of a felony, and was found not to have been in possession of a firearm at the time of the commission of the offense.

. . . .

"(c) Violation of subsection . . . (a)(3) or (a)(4) . . . is a severity level 8, non-person felony . . . ."

Count II charged the following:

"That on or about the 7th day of July, 1998, the above-named Defendant, within the above-named County, in the State of Kansas, did then and there being, knowingly possess a firearm, having been convicted of Aggravated Assault, a severity level 7, person felony, within five (5) years preceding such possession, a violation

of K.S.A. 21-4204(a)(3), **Felon in Possession of a Firearm**, a severity level 8, nonperson felony."

Specifically, defendant contends that criminal possession of a firearm is a "status" crime, was not "enacted for the protection of human life or safety" and, therefore, does not support the charge of involuntary manslaughter. Further, defendant argues that Kansas law requires that an offender take some action that imminently threatens public safety, such as battering someone, excessively speeding, running through a stop sign, or illegally distributing a weapon, in order to convict him or her of involuntary manslaughter.

The State argues that the court need only look to the legislative intent behind the statute in order to determine that it was enacted for the protection of human life or safety. When the statute was initially enacted in 1969, it was placed under Chapter 21, Article 42, entitled "Crimes Against the Public Safety." It remains within that Article today. Further, the State argues the case law cited by defendant is inapplicable.

No Kansas cases have been cited where this issue has been discussed and decided, nor has our research disclosed any. Defendant relies quite heavily on *State v. Underwood*, 228 Kan. 294, 615 P.2d 153 (1980). This reliance is misplaced.

In *Underwood*, the defendant had been convicted of stealing a bicycle in 1974. In 1978, while in possession of a gun, he shot and killed an individual with whom he had been fighting. The State charged Underwood with felony murder, relying on unlawful possession of a firearm as the underlying inherently dangerous felony. The firearm charge was based on the fact that the defendant had been convicted of the 1974 bicycle theft and had possession of a firearm. 228 Kan. at 295-96.

The issue in *Underwood* argued as applicable herein was whether the collateral felony of unlawful possession of a firearm by an ex-felon (K.S.A. 21-4204, the same statute at issue here) was an inherently dangerous felony so as to support the application of the felony murder rule under K.S.A. 21-3401. The court held that it was not, reversing Underwood's conviction. 228 Kan. at 300-01.

Adopting Justice Prager's reasoning in his dissent in *State v. Goodseal*, 220 Kan. 487, 503, 553 P.2d 279 (1976), *Underwood* held that in determining whether a particular collateral felony is inherently dangerous to human life so as to justify a charge of felony murder under K.S.A. 21-3401, the elements of the collateral felony should be viewed in the abstract, and the circumstances of the commission of the felony should not be considered in making the determination. As such, the court continued, the unlawful possession of a firearm proscribed by K.S.A. 21-4204(1)(b) (Weeks) (now K.S.A. 2000 Supp. 21-4204[a][3]), when considered in the abstract, is not a felony inherently dangerous to human life and will not sustain a conviction for murder in the first degree under the felony murder rule. 228 Kan. at 306.

In reaching this determination, the court noted the following rule concerning felony murder and transferred intent:

"The felony murder rule has logic based on the theory of transferred intent. The malicious and premeditated intent of committing the inherently dangerous collateral felony is transferred to the homicide to supply the elements of malice and premeditation without further proof. Consistent with this thinking, most courts require that the collateral felony be inherently dangerous for the felony murder rule to be applicable. 2 Wharton's Criminal Law § 146, p. 210 (14th ed. 1979).

" 'In the typical case of felony-murder, there is no malice in "fact", express or implied; the malice is implied by the "law." What is involved is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by the law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice; and a homicide with malice is common law murder.' 2 Wharton's Criminal Law § 145, p. 204 (14th ed. 1979)." 228 Kan. at 303.

The court continued:

"This crime [unlawful possession of a firearm] is a status crime in that it is limited to drunkards, drug addicts and ex-felons. It is *malum prohibitum*. The possession of the firearm is prohibited because a firearm in the possession of a habitual drunkard, a narcotics addict or an ex-felon is against the public policy of the State as declared by the legislature. The possession of the firearm when viewed in the abstract is not inherently dangerous to human life. This is true because it seems unlikely that mere possession, which has been defined as dominion and control over an object, and not its use, could be undertaken in so dangerous a manner that the prohibited possession would result in murder in the first de-

gree. . . . It appears quite impossible to find an intent in this collateral felony encompassing malice, deliberation and premeditation so as to transfer these elements to the homicide and relieve the prosecution from proof of the same. If these elements are present in the use of the firearm they are not present in the possession of the firearm. They should then be proven as elements of premeditated first degree murder by reason of the malicious and deliberate use of the gun." 228 Kan. at 303-04.

In the case before us, defendant argues that the *Underwood* rationale should be applied to the question of whether criminal possession of a firearm may support the charge of involuntary manslaughter. We disagree.

*Underwood* was decided on whether unlawful possession was a *crime inherently dangerous to human life* as required by the felony murder statute. Involuntary manslaughter as charged herein requires an underlying felony, other than an inherently dangerous felony as defined by K.S.A. 21-3436. The statute further requires only that the underlying felony had been "enacted for the protection of human life or safety." The rule set down in *Underwood* works in felony murder because, as we stated therein, the malice and intent required in homicide is supported by the intentional commission of the underlying felony. Involuntary manslaughter does not require that the killing of the human being be intentional; in fact, it is the unintentional killing of a human being that is prohibited by K.S.A. 2000 Supp. 21-3404.

In addition, as the State points out, K.S.A. 2000 Supp. 21-4204 is included in Article 42 of Chapter 21 of the Kansas Statutes Annotated. Article 42 is entitled "Crimes Against the Public Safety." Also included in Article 42 are the following crimes: criminal use of weapons (K.S.A. 2000 Supp. 21-4201), aggravated weapons violation (K.S.A. 21-4202), criminal disposal of firearms (K.S.A. 2000 Supp. 21-4203), criminal possession of a firearm by a juvenile (K.S.A. 21-4204a), defacing identification marks of a firearm (K.S.A. 21-4205), failure to register sale of explosives (K.S.A. 21-4207), failure to register receipt of explosives (K.S.A. 21-4208), criminal disposal of explosives (K.S.A. 21-4209), criminal possession of explosives (K.S.A. 21-4209a), carrying concealed explosives (K.S.A. 21-4210), refusal to yield a telephone party line (when in-

formed it is needed for an emergency) (K.S.A. 21-4211), creating a hazard (K.S.A. 21-4212), unlawful failure to report a wound (K.S.A. 21-4213), obtaining prescription-only drug by fraudulent means (K.S.A. 2000 Supp. 21-4214), obtaining a prescription-only drug by fraudulent means for resale (K.S.A. 21-4215), selling beverage containers with detachable tabs (K.S.A. 21-4216), criminal discharge of a firearm (K.S.A. 21-4217), unauthorized possession of a firearm on the grounds of or within certain state-owned or leased buildings and county courthouses (K.S.A. 21-4218), criminal discharge of a firearm (K.S.A. 2000 Supp. 21-4219), and unlawful endangerment (while involved in the production of a controlled substance) (K.S.A. 2000 Supp. 21-4220).

Considering the tenor of the crimes contained in Article 42 of the Chapter 21, it is clear that they were all enacted for the protection of human life or safety. It seems unreasonable to pull criminal possession of a firearm (K.S.A. 2000 Supp. 21-4204) out of this list and find that it was not enacted for such a purpose. Prohibiting a convicted felon from possessing a firearm for a specified time after his or her conviction is clearly grounded on protecting human life or safety as opposed to further punishing the felon.

Defendant's argument that a statute "enacted for protection of human life or safety" requires that an offender take some action that "imminently" threatens public safety also fails. As is clear from the list of Chapter 42 crimes, imminent risk to human life or public safety is not an element of many of the offenses and, logically, there is no reason that the protection of human life and safety should be so limited.

We conclude that criminal possession of a firearm (K.S.A. 21-4204) is a statute enacted for the protection of human life or safety and, accordingly, may serve as the underlying crime in a charge of involuntary manslaughter. The district court did not err in refusing to dismiss the involuntary manslaughter charge.

## CRIMINAL POSSESSION OF A FIREARM CONVICTION

The State presented evidence and argued that the defendant possessed the firearm on three separate occasions on July 7, 1998: (1) When he and his brother were shooting at cans; (2) when de-

fendant shot his brother; and (3) when defendant retrieved the gun after the deputy asked where it was. The State argued either occasion (1) or (3) could be used to find defendant guilty of Count II (criminal possession of a firearm). Defendant had different defenses to each. As to the can shooting incident, defendant denied this had occurred and that the officer who testified that defendant told him of this incident was mistaken. As to the retrieval of the gun, defendant testified he was acting under orders of the deputy. Further, these two incidents occurred at different times and places. While giving jury instructions, the trial court did instruct the jury that they were to consider possible multiple acts when rendering their verdict. However, the court did not give an instruction requiring that the jurors reach a unanimous decision as to the underlying incident of possession, even though the court was concerned about possible juror confusion.

The parties agree that failure to give a unanimity instruction is reversible error.

This result is in accordance with our recent case of *State v. Hill*, 271 Kan. 929, Syl. ¶ 3, 26 P.3d 1267 (2001), wherein we held:

"In a criminal case involving convictions for rape, aggravated indecent liberties with a child, and aggravated indecent solicitation of a child, the record is reviewed and it is held: (a) A two-step harmless error analysis is applied to the defendant's contention that a unanimity instruction should have been given in a multiple acts case. In applying a two-step harmless error analysis, the first step is to decide whether there is a possibility of jury confusion from the record or if evidence showed either legally or factually separate incidents. Incidents are legally separate when the defendant presents different defenses to separate sets of facts or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents. Incidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by 'a fresh impulse.' When jury confusion is not shown under the first step, the second step is to determine if the error was harmless beyond a reasonable doubt with respect to all acts."

The two incidents involved legally and factually separate incidents. Further, there was a possibility of juror confusion as shown by the trial court's comments. The parties are correct that reversible error occurred when no unanimity instruction was given in this multiple acts count.

The judgment is affirmed in part and reversed in part. The case is remanded for further proceedings as to Count II, criminal possession of a firearm.