No. 86,605

STATE OF KANSAS, *Appellee,* v. KENYON T. CAMPBELL, *Appellant.*

(44 P.3d 349)

Opinion filed April 19, 2002.

*Penny R. Moylan,* of Topeka, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant was convicted of first-degree murder, aggravated kidnapping, aggravated criminal sodomy, kidnapping, attempted rape, attempted kidnapping, and two counts of aggravated robbery. Defendant entered into a sentence agreement with the State. Defendant was sentenced on the first-degree murder and aggravated kidnapping counts; however, imposition of sentence was suspended on the remaining counts for more than 3½ years. Campbell challenges (1) the district court's jurisdiction to later impose sentence on those counts, (2) the failure to suppress statements, and (3) the sufficiency of the evidence to support his conviction for aggravated criminal sodomy and attempted rape. The State argues that the defendant waived his right to appeal his conviction.

On the evening of March 22, 1996, just prior to 9 p.m., Allen Tanner was approached by two armed men, later identified as Kenyon Campbell and Ronald Etheridge, upon his arrival in the parking lot of "Obsessions," a club that featured exotic dancers. The two men got into Tanner's vehicle, forcing Tanner into the passenger seat. The men drove to a parking lot filled with semi-tractors and trailers. After parking the vehicle between two trailers, the men held Tanner at gunpoint, threatened his life, and asked for his money. The men then locked Tanner in the trunk of Tanner's car. After approximately 10 minutes, Tanner freed himself from the trunk, located the keys to his vehicle, drove to a convenience store, and called the police. Tanner was unable to identify the perpetrators. He testified both assailants wore surgical gloves, that one man was black, and that he believed the other man was also black.

Later that evening, Campbell and Etheridge, armed with guns, wearing ski masks and white latex gloves, burst into "Fantasy Private Dancers" (Fantasy), a private nude dancing business. Only two people, a female employee, D. C., and a male truck driver, Jonathan Broughman, were inside at the time. Initially, the first masked male, who was probably Etheridge, looked for money in the back of Fantasy, while the second masked male, Campbell, held D. C. and Broughman at gunpoint. After about 5 to 10

minutes, Etheridge returned and forced D. C. to the back of the business. Etheridge looked for money but was unable to find any. While holding a gun to D. C.s' head and threatening to kill her, Etheridge forced her to perform fellatio on him. Etheridge then forced D. C. onto her back, tore off her clothes, and attempted to rape her. She testified she did not believe penetration had occurred. Approximately 10 minutes later, Etheridge got up and returned to the front of the business.

Campbell, who had remained in the front of Fantasy, took $80 to $85 from Broughman at gunpoint, forced Broughman onto the floor, jerked the phone cords out of the wall, kept a lookout, looked toward the back of Fantasy a couple of times, and yelled for Etheridge to hurry up. Broughman testified he heard moaning, heavy breathing, and grunting coming from the back, as well as ransacking and locker doors slamming.

Shortly after Etheridge returned to the front, Campbell stated, "Somebody's coming," and both men headed outside to the parking lot. Broughman went to the back of Fantasy. He found D. C. naked and attempting to put on her clothes. While still inside, Broughman and D. C. heard between three to five gunshots outside the building. As Broughman and D. C. left Fantasy, they observed a man laying face down in the parking lot beside a car with its trunk open. Neither Broughman nor D. C. checked on the injured man, or observed the man move.

When police arrived at Fantasy, they discovered a man lying face down in the parking lot beside a car with its trunk open. The man was not breathing and had no pulse. The man was later identified as John Rees II. The cause of Rees' death was a gunshot wound to the chest. Rees had been shot three times in the back. The bullets had exited through his chest. Four spent cartridge cases fired from the same 9 millimeter handgun were found at the scene. A handgun was found in a ditch near Fantasy. It was not the gun used to fire the cartridge cases.

On April 1, 1996, Campbell's girlfriend, Shanell Walters, was contacted by police. Walters stated that Campbell had told her that he and Etheridge had robbed a couple of people and shot someone. Walters later testified that Campbell said he and Etheridge had

robbed a guy, took his wedding band, and stuck him in the trunk of his car. Campbell also told Walters that he and Etheridge had gone into a club and robbed it, tore out phone lines, and held people at gunpoint on the floor. Campbell stated that Etheridge had raped a girl in the back room. Walters testified Campbell tore a picture of Rees from the newspaper and indicated to her that he was the man who had been shot. Campbell had stated that when Rees drove up to the club, they went out and confronted him. They planned to stick him in the trunk of his vehicle as they had done previously to another man, but instead Etheridge shot Rees five times as Rees attempted to run away. Campbell told Walters he had thrown his gun away as he ran to the van driven by his brother, Rodney Campbell. They later burned their masks and gloves and disposed of Etheridge's gun. Shortly thereafter, Campbell, Rodney, and Etheridge left for Chicago.

The police persuaded Walters to contact Campbell at his mother's house in Chicago. Campbell had given her the number. The police dialed the number and she spoke with Campbell on a phone in the Sheriff's Department in the presence of detectives. The conversation was recorded with Walters' permission. The detectives wrote some of the questions for Walters to ask Campbell during the conversation. Walters made subsequent calls to Campbell in Chicago, which were also recorded with her permission. The purpose of the calls was to obtain information of the crime, to corroborate Walters' story, and to determine Campbell's location. Campbell was later arrested.

Rodney Campbell, Campbell's brother, testified that he drove the van for Campbell and Etheridge during that night. Rodney had borrowed the van from an acquaintance who was out of town. Rodney testified he had driven himself, Etheridge, and Campbell to "Obsessions." After being parked for a few minutes, another vehicle pulled into the parking lot and Etheridge and Campbell, both armed with handguns, got into the vehicle with the driver. Rodney followed the vehicle to a parking lot filled with semi-tractors, parked where he was unable to see the other vehicle, and waited for Campbell and Etheridge to return. When Campbell and Etheridge returned to the van, Rodney drove them back to his house.

Campbell and Etheridge told Rodney they had gotten a watch and some money off the man and that they had put him in the trunk of the vehicle. Rodney testified that prior to this, the men had talked about finding a way to get some money and robbing someone and the fact that they knew people who worked at these types of clubs and that their customers had a lot of money.

Rodney testified that later that evening he drove Campbell and Etheridge to Fantasy, where Rodney and Etheridge knew one of the employees. When they arrived, there was a semi-tractor parked in the parking lot. Rodney dropped Etheridge and Campbell off and was told to come back and pick them up in 3 to 4 minutes. Etheridge and Campbell had indicated to Rodney that they thought the truck driver had some money. When Rodney was returning to pick up Etheridge and Campbell, he saw them running towards the van. After getting in the van, both Campbell and Etheridge indicated that Etheridge had shot a guy in the Fantasy parking lot. Etheridge indicated that while they were leaving the club he had shot a man who had attempted to run. Rodney testified that Campbell had taken the money from the truck driver and stayed in the front of the club, while Etheridge was in the back room with a female employee. Campbell told Rodney he did not know what went on between Etheridge and the girl in the back room because he stayed up front. Campbell did not have his gun with him when he got back in the van and indicated to Rodney that he had thrown it away. Rodney testified that the next day, the men burned their clothing, the gloves, and the stocking caps that had holes cut in them, and tossed Etheridge's gun into the river. Rodney testified that Etheridge and Campbell had worn white surgical gloves they had gotten out of the van.

The police were unable to recover Etheridge's weapon after searching the river. Both Campbell's and Rodney's fingerprints were found inside the van. No evidence was found at the location at which Tanner indicated he had been robbed and forced into the trunk of his vehicle.

On April 4, 1996, Campbell was charged with kidnapping, two counts of aggravated robbery, aggravated kidnapping, aggravated criminal sodomy, attempted rape, attempted kidnapping, at-

tempted aggravated robbery, and first degree murder. A jury convicted Campbell of all these charges, with the exception of the attempted aggravated robbery count. Campbell's motions for a new trial and a judgment of acquittal were denied. The matter was set for sentencing.

Prior to sentencing, Campbell entered into the following agreement with the State:

"1. [Campbell] agrees to cooperate fully with law enforcement agencies in the investigation and prosecution of Ronald Etheridge for the events which gave rise to case 96 CR 619, including recounting all facts of which he is aware and providing all information of which he has any knowledge including any information as to the location of Ronald Etheridge and being interviewed by law enforcement officres [sic] concernig [sic] his knowledge;

"2. [Campbell] agrees to testify truthfully and completely in any proceeding against Ronald Etheridge arising out of this case;

"3. That such truthful testimony would be substantially the same as testimony given in case 97 MS 104.

"4. [Campbell] waives any right to appeal the verdict against him in case 96 CR 619;

"5. In return the State agrees to recommend at the sentencing . . . that [Campbell] receive a controlling sentence of 300 months and, if [Campbell] requests, that he be permitted to serve his sentence in an[d] out of state penal institution. The State agrees it may not use any information gained from [Campbell] against him in this case."

At sentencing, both the State and Campbell's counsel requested that the district judge follow the sentencing agreement and grant a downward durational departure to 300 months on the aggravated kidnapping count. Campbell acknowledged to the judge that he was aware that if he did not follow the terms of the sentencing agreement the State could ask for his agreed-upon sentence to be set aside and request that the maximum sentence be imposed. Campbell thanked the State for allowing him to enter into this agreement. Campbell was sentenced to life on the first-degree murder count and to 300 months on the aggravated kidnapping count, with the 300 months running concurrently. The district judge, however, to insure that Campbell kept his part of the bargain, did not impose sentence on the remaining counts, but took the matter under advisement.

Ronald Etheridge was convicted on November 13, 2000, for his participation in the crimes. On November 30, 2000, more than 3½ years after Campbell was first sentenced and shortly after Campbell refused to testify against Etheridge as agreed, the district court imposed sentence on the remaining counts, sentencing Campbell to 77 months for the aggravated criminal sodomy count, 51 months on each of the two aggravated robbery counts, 51 months on the kidnapping count, 19 months on the attempted rape count, and 34 months on the attempted kidnapping count. Each of the counts was ordered to run consecutively and to run consecutive to his prior sentence for aggravated kidnapping. A notice of appeal was filed December 12, 2000. This court has jurisdiction over the appeal because a life sentence was imposed. See K.S.A. 22-3601(b)(1).

## Jurisdiction to Impose Sentence

K.S.A. 22-3424(c) provides:

"If the verdict or finding is guilty, judgment shall be rendered and sentence pronounced *without unreasonable delay*, allowing adequate time for the filing and disposition of post-trial motions and for completion of such presentence investigation as the court may require." (Emphasis added.)

In Kansas, sentencing is strictly controlled by statute. *State v. Osbey*, 238 Kan. 280, 288, 710 P.2d 676 (1985). The following are the authorized dispositions in sentencing an individual:

"(1) Commit the defendant to the custody of the secretary of corrections . . . or . . . to jail for the term provided by law;

"(2) impose the fine applicable to the offense;

"(3) release the defendant on probation . . .;

"(4) assign the defendant to a community correctional services program . . .;

"(5) assign the defendant to a conservation camp . . .;

"(6) assign the defendant to a house arrest program . . .;

"(7) order the defendant to attend and satisfactorily complete an alcohol or drug education or training program . . .;

"(8) order the defendant to repay the amount of any reward paid . . ., repay the amount of any costs and expenses incurred by any law enforcement agency in the apprehension of the defendant . . ., or repay the amount of any public funds utilized by a law enforcement agency to purchase controlled substances from the defendant during the investigation . . .;

"(9) order the defendant to pay the administrative fee . . . ;

"(10) order the defendant to pay a domestic violence special program fee . . .;

"(11) impose any appropriate combination [of these dispositions]; or

"(12) suspend imposition of sentence in misdemeanor cases." K.S.A. 2001 Supp. 21-4603d(a).

At the time Campbell was sentenced, none of the authorized dispositions allowed a judge to intentionally or inadvertently fail to impose one of the statutory dispositions. See *Osbey*, 238 Kan. at 288.

We note that when a defendant is convicted on several counts, a single judgment should be pronounced declaring the full measure of punishment to be imposed for all offenses. *Osbey*, 238 Kan. at 287; *State v. Woodbury*, 133 Kan. 1, 2, 298 Pac. 794 (1931). Campbell contends that when the district court improperly suspended imposition of a felony sentence, it later lacked jurisdiction to impose sentence on November 30, 2000, because sentence on the suspended felony counts was not imposed "without unreasonable delay." The State asserts that this court lacks jurisdiction to entertain Campbell's appeal, pursuant to K.S.A. 21-4721(c), because he is appealing from a presumptive sentence, and that any delay in sentencing was agreed to by Campbell when he entered into the sentencing agreement and that under these circumstances Campbell was sentenced within a reasonable time. Whether a court has jurisdiction over a matter is a question of law over which this court has unlimited review. *State v. Jacques*, 270 Kan. 173, 191, 14 P.3d 409 (2000).

Pursuant to K.S.A. 2001 Supp. 22-3602(f), appeals from sentences imposed under the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*, for crimes committed on or after July 1, 1993, are allowed only as provided for in K.S.A. 21-4721 and amendments thereto. See *State v. Flores*, 268 Kan. 657, 658, 999 P.2d 919 (2000). In resolving this jurisdictional question, this court must interpret the provisions of the KSGA in effect at the time the defendant was originally sentenced. Interpretation of the KSGA is a question of law over which the Supreme Court has an unlimited scope of review. *State v. Bolin*, 266 Kan. 18, 24, 968 P.2d 1104 (1998).

K.S.A. 21-4721(c) states:

"(c) On appeal from a judgment or conviction entered for a felony committed on or after July 1, 1993, the appellate court shall not review:

(1) Any sentence that is within the presumptive sentence for the crime; or

(2) any sentence resulting from an agreement between the state and the defendant which the sentencing court approves on the record."

This court, however, also has jurisdiction to correct illegal sentences at any time. K.S.A. 22-3504. An illegal sentence is " 'a sentence imposed by a court without jurisdiction, a sentence which does not conform to the statutory provision, either in the character or the term of the punishment authorized, or a sentence which is ambiguous with respect to the time and manner in which it is to be served.' " *State v. Johnson*, 269 Kan. 594, 600, 7 P.3d 294 (2000) (quoting *State v. Duke*, 263 Kan. 193, 194, 946 P.2d 1375 [1997]).

Although Campbell does not specifically claim his sentence was illegal, because Campbell alleges the district court lacked jurisdiction to impose a portion of his sentence, this court has jurisdiction to hear Campbell's appeal as an appeal from an illegal sentence pursuant to K.S.A. 22-3504. In addition, Campbell's appeal may also be considered an appeal from an illegal sentence because the district judge failed to impose a specific term for confinement when the judge sentenced Campbell. See *Osbey*, 238 Kan. at 280 (where defendant was convicted of first-degree murder and unlawful possession of firearm and sentence on the possession charge was not imposed until a year after sentence on the murder charge, defendant's original sentence was illegal because a specific term for confinement was not imposed at sentencing).

Campbell cites to *Mintie v. Biddle*, 15 F.2d 931 (8th Cir. 1926), a federal circuit court case out of Kansas, where after the defendant pled guilty the case was continued without imposition or entry of an order. Extrinsic oral evidence revealed that the sentence was withheld because the government desired to use the defendant as a witness against a codefendant. Over 2½ years later, the defendant was subpoenaed to appear as a witness against a codefendant. After the codefendant pled guilty, the defendant was sentenced. The defendant filed a writ of habeas corpus. The trial court denied the writ, holding that the delay between plea and sentencing occurred by the defendant's consent. The Eighth Circuit Court of Appeals

reversed, finding that the sentencing court lost jurisdiction to impose sentence because sentencing had been indefinitely postponed. 15 F.2d at 933. The *Mintie* court also held that consent of the defendant to the postponement of the sentence could not cure a lack of jurisdiction because jurisdiction was lost when the sentence was postponed indefinitely. 15 F.2d at 932.

The decision in *Mintie*, however, was not followed by the United States Supreme Court in *Miller v. Aderhold*, 288 U.S. 206, 77 L.Ed. 702, 53 S.Ct. 325 (1933). In that case, the Supreme Court recognized the weight of authority at the time favored the permanent suspension of a sentence as being void and resulting in a loss of jurisdiction by the court. However, the Supreme Court held that because a defendant may demand that sentence be imposed, a defendant consents to the delay in the absence of such a request. 288 U.S. at 210. See also *Zerbst v. Nahas*, 67 F.2d 742 (10th Cir. 1933) (where defendant was sentenced over 2 years after his release following a plea, the court did not lose jurisdiction to impose sentence because defendant never requested sentence to be imposed).

In *People v. Drake*, 61 N.Y.2d 359, 474 N.Y.S.2d 276, 462 N.E.2d 376 (1984) a case involving an unexplained 39-month delay in sentencing, New York's highest court reasoned that whether dismissal for lack of jurisdiction is warranted depends upon both the length of the delay and the reasons for it.

"Generally, where the delay is long and unexplained, the courts will hold it unreasonable [citations omitted]. Conversely, where the delay is not protracted and plausible reasons are offered to explain it, the courts hold that it is not unreasonable. When there has been an extended delay and there are plausible reasons for it, the various factors involved must be balanced." 61 N.Y.2d at 366-67.

New York law assumes the defendant has been prejudiced by unreasonable delay and does not assume consent if the defendant does not demand that sentence be imposed. 61 N.Y.2d at 367.

The State maintains this court has previously declined to find a loss of jurisdiction to sentence a defendant under facts similar to this case. In *Osbey*, the sentencing court failed to sentence the defendant on one of the two counts of which she was convicted. One year later, the defendant was sentenced on the remaining

count, with the sentence ordered to run concurrent with her life sentence. The *Osbey* court determined the error was inadvertent and not prejudicial and upheld the sentence on the second count. The failure of the judge to impose a specific term when sentencing was held to be an illegal sentence. The *Osbey* court also held that "[w]here a person convicted of a crime has never been legally sentenced, a proper sentence may later be imposed." 238 Kan. at 288. See also *State v. Fennell*, 218 Kan. 170, 178, 542 P.2d 686 (1975) (a void sentence may be corrected by imposition of valid one), and *Richardson v. Hand*, 182 Kan. 326, 329, 320 P.2d 837 (1958) (a void sentence may be changed to a valid sentence without violating the rule that when a valid judgment and sentence have been entered, the court has no jurisdiction after the sentence has been executed to set aside or impose a new sentence).

Applying the rationale of *Osbey*, the district court had jurisdiction to sentence Campbell on the suspended counts. Campbell's original sentence was illegal because the court did not impose sentence for a definite term of confinement. Campbell could have demanded to be sentenced on these additional counts at the first sentencing, and his failure to do so constituted consent to the delay. Thus, the district court had jurisdiction to impose sentence on the remaining counts. In addition, Campbell agreed to the delay in imposing his sentence, and he received nothing more than what he had bargained for in entering into the sentencing agreement.

## Waiver of Right of Appeal

As to Campbell's additional claims on appeal, the State contends Campbell waived the right to appeal his conviction when he entered into the sentencing agreement with the State. We agree.

"The right of appeal is entirely a statutory right; no appellate review is required by the United States Constitution, [citation omitted], or the Kansas Constitution, [citation omitted]." *State v. Ji*, 255 Kan. 101, 102, 872 P.2d 748 (1994). A defendant's right to appeal from a judgment is set forth in K.S.A. 2001 Supp. 22-3602(a). "Where it can be shown that the defendant was fully aware of his or her right to appeal, or was fully advised of his or her right to appeal by counsel at the time of sentencing, a waiver of that

right may be established." *State v. Willingham*, 266 Kan. 98, Syl. ¶ 2, 967 P.2d 1079 (1998). A knowing and voluntary waiver by the defendant of his statutory right to appeal is generally enforceable. *United States v. Hernandez*, 134 F.3d 1435, 1437 (10th Cir. 1998).

In this case, the written sentencing agreement signed by Campbell specifically stated that Campbell "waives any right to appeal the verdict against him." At sentencing, Campbell affirmed that the written agreement constituted the sentencing agreement as he understood it. Although the district judge did not specifically inform Campbell of his right to appeal at the sentencing hearing and ask Campbell whether such waiver was done freely and knowingly, Campbell's counsel acknowledged that the sentencing agreement was contingent upon Campbell not pursuing his right to appeal his conviction. The State also stated to the district court that Campbell had agreed to waive his appeal rights.

A sentencing court is required by statute to advise a defendant of the defendant's right to appeal after imposing sentence. K.S.A. 22-3424(f). However, failure to fully advise a defendant of this right does not necessarily preclude a defendant's specific waiver of the right to appeal. See *Willingham*, 266 Kan. 98, Syl. ¶ 2.

Campbell does not allege the waiver of the right to appeal his convictions was not done freely and knowingly. In fact, Campbell does not even address the issue of waiver. Campbell bargained with the State for a reduction in sentence in exchange for his cooperation, testimony against Etheridge, and waiver of his appeal rights. The State abided by the terms of the agreement. Thus, Campbell knowingly and voluntarily waived the right to appeal his conviction when he entered into the sentencing agreement with the State. Therefore, we need not address Campbell's additional claims on appeal.

Affirmed.