No. 86,739

STATE OF KANSAS, *Appellee*, v. QUINCY B. DAVIS, *Appellant*.

61 P.3d 701

Opinion filed January 24, 2003.

*Patrick H. Dunn*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Jeffery V. Rowe*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions of premeditated first-degree murder, aggravated kidnapping, aggravated burglary, criminal possession of a firearm, and aggravated robbery. Defendant asserts (1) the trial court erred in failing to give a unanimity instruction; (2) there was insufficient evidence to support the aggravated kidnapping conviction; (3) there was prosecutorial misconduct; (4) the court erred in calculating defendant's criminal history score; and (5) the trial court failed to instruct on the lesser included offense of second-degree murder.

Sometime after 10 p.m. on January 25, 2000, Davion Johnson was fatally wounded at his home on 601 North Poplar in Wichita, Kansas. The 911 call was received at approximately 10:30 p.m. Paramedics arrived at the scene approximately 4 minutes later. Johnson's mother, Betty Johnson, and her friend, Mary Gray, were in the house when the paramedics arrived. Johnson was still alive. Johnson died at approximately 4 a.m. the following day. The cause of death was a gunshot wound to the head that perforated the brain and caused multiple skull fractures.

Police recovered a cartridge casing from a .38 caliber handgun on the living room floor of the house; a cigarette butt on the sofa; a loaded .45 caliber handgun from a dresser in the bedroom; scales, razor blades, baggies, and white powder from the kitchen; and approximately $3,000 from a dresser in the den.

Around 1:30 a.m., while police were still investigating, S.K.F. arrived at the house on foot and hysterical. She was wearing light clothing, even though the night was cold, and no shoes. S.K.F. told police that Quincy Davis had shot her boyfriend (Johnson) and that she knew where Davis was because he had kidnapped her and taken her to a house at 421 North Spruce where she was held until she escaped.

At approximately 5:50 a.m., police executed a search warrant on the residence at 421 North Spruce. Police discovered Davis asleep on the couch in the basement. In performing a pat-down search of Davis, five rounds of ammunition fell from a pocket of the black leather jacket he was wearing. A loaded handgun was on the floor under the couch. The gun contained four cartridges, one in the chamber and three in the magazine. The first cartridge in the magazine was backward. No identifiable fingerprints were found on the gun. Also seized were a purse, cigar box, and savings deposit register from the couch; a pair of shoes from the floor by the couch; and a cell phone from the range in the kitchen. The cell phone was later determined to be Johnson's.

At the police station, police removed a key ring containing five keys from Davis' left front pants pocket. One of the keys was to Johnson's vehicle. Police also recovered $59 in cash from Davis.

Davis was charged with premeditated first-degree murder, aggravated kidnapping, rape, aggravated criminal sodomy, aggravated burglary, criminal possession of a firearm, and attempted aggravated robbery. The information was later amended by deleting the charge of attempted aggravated robbery and adding one count of aggravated robbery.

Twenty-two-year-old S.K.F. had known Johnson and been his girlfriend since 6th grade. S.K.F. and Johnson lived together for 4 years prior to Johnson's death. They lived together at 601 North Popular for nearly 1 year. S.K.F. and Johnson had known Davis for years. S.K.F. testified that neither she nor Johnson had ever had a friendship or relationship with Davis.

S.K.F. testified that on the evening of the shooting, Johnson picked her up from work around 7 p.m. S.K.F. worked as a dancer at Pleasures nightclub and as a nonmedical aide to her aunt. They

arrived at 601 North Poplar between 8 and 9 p.m. Shortly thereafter, Johnson left to obtain marijuana. While he was gone, S.K.F. test-drove her car because she had been having problems with it. After her car stalled a few blocks from the house, she called Towanda Acon, Johnson's cousin, for help. Acon arrived between 9:30 and 9:45 p.m. After pushing the car back to the house, Acon stayed for 2 to 5 minutes.

According to S.K.F., Johnson returned home between 9:45 and 10 p.m., approximately 5 to 10 minutes after Acon left. S.K.F. testified that minutes later, while she and Johnson were in the kitchen laughing and visiting, there was a knock on the front door. S.K.F. looked out the peephole and saw Quincy Davis. Johnson then looked out the peephole, cracked the door open, and began talking to Davis. S.K.F. was standing behind Johnson but was unable to hear what the two were talking about. S.K.F. thought Davis asked Johnson where he could find someone, possibly by the name of Darnell. Davis asked Johnson if he could step inside because it was cold. Johnson took a couple of steps back and allowed Davis to step inside and close the door. While the two were still talking, S.K.F. obtained a pipe cigar off the kitchen table and stood by the couch. S.K.F. dropped the cigar when she heard a loud gunshot and saw Johnson drop to the floor.

Immediately thereafter, Davis pulled items from Johnson's right front pants pocket, where Johnson kept his cell phone, car keys, and small amounts of money. Davis then turned the gun on S.K.F. and asked "where the money was." S.K.F. told Davis that she did not have any money because someone had broke into the house in early December and taken it. Davis forced S.K.F., at gunpoint, into the den where she pretended to look in a dresser. S.K.F. lied to Davis by telling him there was no money in the dresser and that the money was in the bank.

Davis forced S.K.F. to grab her purse and car keys and took her out the back door of the house. S.K.F. had observed a vehicle pull up to the house just after the shooting. Davis and S.K.F. left through the back door of the house because Davis had also observed the car pull up. Before leaving, S.K.F. noticed that Johnson was still breathing.

S.K.F. was forced at gunpoint into a maroon four-door Explorer. As Davis was driving away, S.K.F. saw Betty Johnson look through the window of the house, knock on the front door, and then return to the car.

Davis drove for awhile with the gun in his hand in his lap. S.K.F. tried to convince Davis to let her go so that she could be with Johnson. Davis told S.K.F. that he would let her go once he was convinced that she would not go to the police. S.K.F. believed Davis had consumed Hennessey, an alcoholic beverage, because of a bottle that was in the vehicle.

According to S.K.F., Davis stopped the vehicle at 421 North Spruce. While parked, another vehicle pulled up behind and a female came out of the house, got into the vehicle, and left. Larry Marzett then came out of the house and got into the vehicle with Davis and S.K.F. After a short discussion, the three went in the house.

The three stayed upstairs in the house for a few minutes and then Davis made S.K.F. go downstairs to where the couches and television were located. Shortly thereafter, Marzett left the house to get cigarettes and cigars. When Marzett returned 30 to 45 minutes later, Davis went upstairs and talked to him. Another man that S.K.F. did not know, later determined to be Marzett's cousin, had returned with Marzett. A few minutes later, Marzett and his cousin left.

S.K.F. and Davis remained downstairs on the couch watching television. The gun was in Davis' pocket. At some point, Davis told S.K.F. to stand up and pull down her pants. S.K.F. testified that Davis then stuck two fingers in her vagina and one finger in her anus. Later, S.K.F. asked to use the restroom. Davis accompanied her, commenting, "You think I'm stupid."

Sometime between 1 and 2 a.m., Davis placed S.K.F.'s right hand between the palm of his hands so that if he fell asleep he could detect if she moved. When he fell asleep, S.K.F. was able to slide her hand from between Davis' hands and go upstairs. S.K.F. kicked off her shoes and grabbed a cup before going upstairs so that if she were caught by Davis she could claim that she was going for water. When S.K.F. got upstairs, she opened the door and took

off running because she believed that the house security alarm would go off when she opened the door. S.K.F. ran to 601 North Poplar where she came into contact with police officers who were stationed outside the house. S.K.F.'s feet were injured by glass that she had stepped on while running.

Betty Johnson and Mary Gray arrived at 601 North Poplar to visit Betty's son and to obtain money from him between 10 and 10:30 p.m. When getting out of the car, Betty observed what she thought was a red Bronco with tinted windows driving away. The lights were on in the house, but there was no answer to her knocks on the front door and window of the den. Betty returned to the car and had begun to leave when Gray noticed the back door of the house was open. Upon entering the house, Betty discovered Johnson lying on the living room floor still breathing. Betty called 911. While checking Johnson, Betty testified that she turned him slightly to obtain his billfold from his pocket. Johnson's billfold contained between $500 and $1,000.

On the day of the shooting, Larry Marzett was staying at 421 North Spruce. Marzett grew up with and was a friend of Davis. Marzett loaned Davis his brother's Explorer that night. When Davis returned, he was accompanied by S.K.F. While Davis and S.K.F. were sitting in the vehicle in the driveway, Marzett's girlfriend came out of the house and left and Marzett got into the Explorer with Davis and S.K.F. Marzett, who had been drinking Hennessey that day, did not know if Davis had also been drinking. Marzett, Davis, and S.K.F. then went into the house.

Marzett testified that he left Davis and S.K.F. alone in the house when he went for cigarettes. According to Marzett, when he returned with cigarettes and his cousin, Davis and S.K.F. were "[h]ooked up downstairs." About 10 to 15 minutes later, Marzett and his cousin left the house to go to a club.

Davis, 26 years old, testified that he had been friends and known Johnson since approximately 1988 and had known ·S.K.F. since 1991 or 1992. Davis testified that he dated S.K.F. in July 1999, while she was living with Johnson. The relationship ended in September 1999. Davis and S.K.F. kept their relationship a secret from Johnson. During the relationship, Davis' contact with S.K.F., ini-

tiated through phone calls and pages, was frequent. After the relationship ended, S.K.F. still contacted Davis occasionally.

Davis testified that S.K.F. paged him about 2 weeks prior to the shooting and that he met with her. At that time, S.K.F. asked Davis if she could borrow his black leather jacket. Davis agreed.

Davis testified that he spent the day of January 25, 2000, riding around with Marzett and that he went to Marzett's house at 421 North Spruce and had planned to go to the club with Marzett that night. Davis was not feeling well that day, so he did not start to drink Hennessey until Marzett's girlfriend came over that evening.

Davis testified that at about 10 p.m. he received a numerical page. When he called the number on the page, S.K.F. answered and asked Davis to come over. S.K.F. seemed panicky and was talking very fast. When Davis arrived at 601 North Poplar in Marzett's brother's red Explorer, he noticed Johnson's car in the driveway and started to leave. S.K.F. then came out the back door of the house waving and informed Davis that Johnson had been shot but was still breathing.

Davis testified that when he entered the house he saw Johnson lying on the floor of the living room with a hole in his head. S.K.F. told Davis that Johnson's mother was supposed to be stopping by to pick up money for a bedroom set. S.K.F. panicked when she saw Johnson's mother pull up. After being there less than a minute, Davis left the house. S.K.F. followed Davis out of the house with her keys, Davis' black leather jacket, and her purse. S.K.F. appeared nervous and said: " 'They going to know I was here. They going to think I had something to do with this.' "

S.K.F. and Davis departed in the Explorer. Davis testified that while driving, he asked S.K.F. who shot Johnson. S.K.F. told Davis that she did not want to talk about it. After pulling into the driveway at 421 North Spruce, Marzett jumped into the back seat and grabbed the bottle of Hennessey that was in front. All three then went inside the house.

Davis testified that while he and Marzett went to get cigarettes and cigars, S.K.F. stayed in the basement of the house. Before they left for the store, Davis took his black leather jacket from S.K.F. Davis and Marzett were gone about 15 minutes. While they were

gone, Davis discovered a cellular phone, ammunition, and keys in the pockets of the jacket.

Only seconds after they returned to the house, Marzett left again, telling Davis he would be back in 30 to 40 minutes. While Marzett was gone, Davis and S.K.F. were in the basement. S.K.F. still refused to talk about what had happened, saying that she was going to go to the police in the morning. When Marzett finally returned, Marzett's cousin was with him. Marzett asked Davis if he was ready to go the club. Davis decided not to go. Marzett and his cousin left to go to the club.

While Davis and S.K.F. were downstairs, Davis got sleepy after smoking marijuana and fell asleep with his head in S.K.F.'s lap. S.K.F. informed Davis that she needed to use the restroom and Davis moved his head. Davis fell back asleep and the next thing he remembered was the police waking him up.

Davis testified that when S.K.F. first came in the house at 421 North Spruce she had asked to use the restroom but was too shy to go by herself. Davis accompanied S.K.F. to the restroom at her request. Davis denied that he engaged in any sexual acts with S.K.F. that night.

The bullet entered Johnson's body at his right eyebrow, traveling slightly downward and slightly to the left. Stippling was present, indicating the shot was fired at a range of within 18 inches. The toxicology report revealed the presence of marijuana in Johnson's system. Gary Miller, a firearm and toolmark examiner, testified that the cartridge case found on the floor of the living room at 601 North Poplar and the bullet recovered from Johnson's body were fired from the loaded handgun found under the couch where Davis was sleeping in the house on 421 North Spruce.

After a 4-day jury trial, Davis was convicted of premeditated first-degree murder, aggravated kidnapping, aggravated burglary, criminal possession of a firearm, and aggravated robbery. Davis was acquitted of the charges of rape and aggravated criminal sodomy. After denying Davis' motion for judgment of acquittal, Davis was sentenced to life (hard 25) (murder); 653 months (aggravated kidnapping); 34 months (aggravated burglary); 9 months (criminal possession of a firearm); and 61 months (aggravated robbery). The

sentences were ordered to run consecutively. Davis filed a timely notice of appeal. This court has jurisdiction pursuant to K.S.A. 22-3601(b).

## Unanimity Instruction

Davis contends the trial court erred in failing to give an unanimity instruction. Specifically, he asserts that the confusing language of the aggravated robbery instruction allowed members of the jury to rely upon different acts to satisfy the elements of aggravated robbery. Davis did not object to the language of the aggravated robbery instruction or to the failure of the trial court to give a unanimity instruction at trial.

Unless the instruction is clearly erroneous, no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection. Opportunity shall be given to make objections out of the hearing of the jury. K.S.A. 2001 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. *State v. Parker*, 273 Kan. 56, Syl. ¶ 2, 41 P.3d 789 (2002); *State v. Saenz*, 271 Kan. 339, 346, 22 P.3d 151 (2001).

In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. The jury must be unanimous as to which act or incident constitutes the crime in such a case. *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994); *State v. Donham*, 29 Kan. App. 2d 78, 85, 24 P.3d 750, *rev. denied* 272 Kan. 1421 (2001). Whether a case is a multiple acts case is a question of law over which this court has unlimited review. *State v. Hilson*, 28 Kan. App. 2d 740, 742, 20 P.3d 94, *rev. denied* 271 Kan. 1039 (2001).

The jury in this case was instructed as follows on the charge of aggravated robbery:

"In Count Seven, the defendant is charged with the crime of aggravated robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally took property from the person or presence of Davion Johnson and S.K.F.;

"2. That the taking was by threat against the person of Davion Johnson or S.K.F., or by force;

"3. That the defendant inflicted bodily harm on any person in the course of such conduct; and

"4. That this act occurred on or about the 25th day of January, 2000, in Sedgwick County, Kansas."

Davis contends that the language of this instruction allows for a multitude of possible scenarios that the individual members of the jury could have relied upon in arriving at the elements of aggravated robbery. He asserts that the members of the jury could have found that he took property from Johnson and S.K.F. and that either threat or force was inflicted against either Johnson or S.K.F. Thus, Davis argues that it is impossible to determine whether the verdict was unanimous.

In *State v. Hill*, 271 Kan. 929, 26 P.3d 1267 (2001), this court adopted a two-step harmless error analysis for determining whether a unanimity instruction should have been given in a multiple acts case. The *Hill* court noted:

"In applying a two-step harmless error analysis, the first step is to decide whether there is a possibility of jury confusion from the record or if evidence showed either legally or factually separate incidents. Incidents are legally separate when the defendant presents different defenses to separate sets of facts or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents. Incidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by 'a fresh impulse.' When jury confusion is not shown under the first step, the second step is to determine if the error was harmless beyond a reasonable doubt with respect to all acts." 271 Kan. 929, Syl. ¶ 3.

To support his argument, Davis cites *State v. Owens*, 272 Kan. 682, 35 P.3d 791 (2001). In *Owens*, the defendant was convicted of involuntary manslaughter and criminal possession of a firearm. On the criminal possession charge, the State presented evidence of three separate occasions on which the defendant possessed the firearm. The State argued that two of these occasions could be used to find the defendant guilty of the charge. The defendant had different defenses to each occasion. The trial court instructed the jury

to consider multiple acts in rendering its verdict, but did not instruct the members of the jury that they had to be unanimous as to the underlying incident of possession.

On appeal, the parties agreed that the trial judge's failure to give a unanimity instruction was reversible error. The *Owens* court agreed and reversed the defendant's conviction, reasoning that the two incidents involved legally and factually separate incidents. The *Owens* court also noted that the possibility of juror confusion was evident from the trial court's own comments. 272 Kan. at 690.

The State argues that this is not a multiple acts case because there was no evidence that Davis committed separate acts that would alternatively satisfy the elements of aggravated robbery. The State asserts that the only evidence of a taking was the alleged taking of the keys, cell phone, and cash from Johnson after Davis shot Johnson. The State points out that S.K.F. testified that she voluntarily left her purse, shoes, and keys in the basement at 421 North Spruce when she escaped; therefore, S.K.F.'s choice to leave her personal belongings did not constitute a separate set of facts that could constitute aggravated robbery.

The State's assertions are correct. The second amended information charged that Davis did "unlawfully, take property, to-wit: a cell phone from the person or presence of another, to-wit: Davion Johnson and S.K.F., by force or threat against the person of Davion Johnson and S.K.F., and inflicted bodily harm upon Davion Johnson and S.K.F. in the course of said robbery." The only evidence of an alleged taking at trial was the taking of the keys, cell phone, and cash from Johnson. S.K.F. testified that she, albeit at Davis' demand, took her purse and keys with her from the house on 601 North Poplar. There was no evidence that Davis took any of these items from S.K.F. There was also no evidence that S.K.F. was unable to take these items when she escaped from the house on 421 North Spruce. In addition, during closing argument, the prosecutor referred to the taking of the keys, cell phone, and money from Johnson and did not argue as to a different taking. With allegations and evidence of a single taking, this is not a multiple acts case.

Davis also claims that the jury could have found that Davis used force on Johnson via the gunshot or that Davis threatened Johnson or S.K.F. at different times with the gun. Additionally, Davis asserts that the jury could have relied upon threats Davis made to S.K.F. throughout the night.

The instruction on aggravated robbery clearly required that the *taking* was by threat or force, thus any reference to threats or force that occurred apart from the point in time of the taking are irrelevant because they could not have been relied upon by the jury to find Davis guilty of aggravated robbery. As for the possibility that the members of the jury may have relied upon different ways in which the elements of aggravated robbery were met, that is an issue of alternative means rather than multiple acts. See *Timley*, 255 Kan. at 289-90.

In *Timley*, this court noted that in an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed, as long as substantial evidence supports each alternative means. 255 Kan. 286, Syl. ¶ 1. Neither party argued that this case involved alternative means.

Therefore, although the instruction in this case was complicated and confusing, because there were no multiple acts, the trial court did not err in failing to give a unanimity instruction.

### Sufficiency of Evidence for Aggravated Kidnapping

Davis contends that there was insufficient evidence to support his conviction for aggravated kidnapping. When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999); *State v. Abel*, 261 Kan. 331, 337, 932 P.2d 952 (1997). Circumstantial evidence may establish even the gravest offenses. *State v. Murillo*, 269 Kan. 281, 286, 7 P.3d 264 (2000); *Abel*, 261 Kan. at 337.

The jury was instructed as follows on the charge of aggravated kidnapping:

"In Count Two, the defendant is charged with the crime of aggravated kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant took or confined S.K.F. by force or threat;

"2. That it was done with the intent to hold S.K.F. to facilitate flight or the commission of any crime;

"3. That bodily harm was inflicted upon S.K.F.; and

"4. That this act occurred on or about the 25th day of January, 2000, in Sedgwick County, Kansas.

"Rape, as defined in Instruction No. 13, constitutes bodily harm for the purpose of this instruction."

S.K.F. testified that on the night of January 25, 2000, Davis forced her to leave the house on 601 North Poplar and go with him to the house on 421 North Spruce. S.K.F. testified that until her escape, Davis forced her to remain at the house on 421 North Spruce, ensuring that she did not leave by placing her hand between the palm of his hands while he slept. At all times, Davis was either pointing a gun at S.K.F., in possession of a gun, or near a gun. Davis told S.K.F. that he would let her go once he was sure she would not tell the police. S.K.F. also testified that Davis, while at the house on 421 North Spruce, penetrated her digitally, both vaginally and anally.

There is clearly evidence to support the elements of taking or confining an individual by force or threat and that the taking or confining was done with the intent to facilitate flight or commission of a crime. Davis contends, however, that there was no evidence that he inflicted any bodily harm upon S.K.F. Davis points out that the only evidence of bodily harm to S.K.F. was S.K.F.'s testimony that Davis penetrated her both vaginally and anally. The jury was instructed that rape would satisfy the required element of bodily harm. Davis asserts that because the jury acquitted him of both the rape and aggravated criminal sodomy charges, there was no bodily harm to support the aggravated kidnapping conviction.

The State agrees with Davis' assertion that the only evidence that would establish bodily harm was S.K.F.'s testimony of vaginal and anal penetration. The State relies, however, upon the fact jury

verdicts need not be consistent. Kansas courts have repeatedly recognized that the conduct of a jury is sometimes devoid of logic and that inconsistent verdicts may result. Even in cases where the two verdicts are irreconcilable, the convictions will not be reversed on grounds of inconsistency. *State v. Shultz*, 225 Kan. 135, 142, 587 P.2d 901 (1978) (citing *State v. McCorgary*, 218 Kan. 358, 543 P.2d 952 [1975], *cert. denied* 429 U.S. 867 [1976]). See *State v. Wise*, 237 Kan. 117, 122, 697 P.2d 1295 (1985); *State v. Goering*, 225 Kan. 755, 759, 594 P.2d 194 (1979); *State v. Ogden*, 210 Kan. 510, 515-16, 502 P.2d 654 (1972); *State v. Freeman*, 198 Kan. 301, 304, 424 P.2d 261 (1967); *State v. Meyer*, 17 Kan. App. 2d 59, 65, 832 P.2d 357 (1992); *State v. Antwine*, 4 Kan. App. 2d 389, 396, 607 P.2d 519 (1980).

This reasoning is not, however, applicable in this case. Here, the jury acquitted Davis of rape, the only crime the jury was instructed would satisfy the required element of bodily harm. The necessary element of bodily harm was, therefore, not met. Acquitting Davis of rape left the jury with no other means of arriving at a guilty verdict for the charge of aggravated kidnapping.

The element of bodily harm in the aggravated kidnapping instruction serves as the only difference between a finding of aggravated kidnapping, K.S.A. 21-3421, and kidnapping, K.S.A. 21-3420. Thus, because the jury, as instructed, found the necessary elements to convict the defendant of the lesser included offense of kidnapping and because there was sufficient evidence to support this lesser offense, this court reduces Davis' conviction for aggravated kidnapping to the lesser offense of kidnapping and remands the case for resentencing. See *State v. Kingsley*, 252 Kan. 761, 782, 851 P.2d 370 (1993).

## Prosecutorial Misconduct

Davis asserts that the prosecutor engaged in prosecutorial misconduct during closing argument by vouching for S.K.F. and making an allegation inferring that Davis was a liar. Davis argues that the prosecutor's conduct denied him a fair trial and that, therefore, he is entitled to a new trial. Additionally, Davis argues that the prosecutor's comments here were more prejudicial than in other

cases because this case was based on his credibility. The State disagrees, arguing that the conduct of the prosecutor was not egregious and did not prejudice Davis. In addition, the State asserts that Davis' failure to object to the prosecutor's statements he now challenges on appeal constituted a waiver.

It is improper for a prosecutor to accuse a defendant of lying. Such an accusation has been recognized by this court as going beyond the wide latitude afforded prosecutors in closing argument. This court continues to recognize as proper, however, the freedom of the prosecutor to craft an argument that includes reasonable inferences based on the evidence and that when a case turns on which of two conflicting stories is true, certain testimony is not believable. The ultimate conclusion as to a witness' veracity remains solely with the jury. See *State v. Douglas*, 274 Kan. 96, 49 P.3d 446 (2002); *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002); *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000).

This court in *Pabst* set forth a two-part test for analyzing the effect of a prosecutor's alleged improper remarks in closing argument stating:

"First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner of presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." 268 Kan. at 505.

The facts of each case must be scrutinized in determining whether the prosecutor's conduct denied the defendant a fair trial. See *State v. Rodriguez*, 269 Kan. 633, 641, 8 P.3d 712 (2000); *State v. Campbell*, 268 Kan. 529, 539, 997 P.2d 726, *cert. denied* 531 U.S. 832 (2000).

This court has previously recognized that reversible error predicated on prosecutorial misconduct must be of such magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Navarro*, 272 Kan. 573, Syl. ¶ 9, 35 P.3d 802 (2001); *State v. Pabst*, 268 Kan. at 504. Such error can normally not be based upon a claim of prosecutorial misconduct absent contemporaneous ob-

jection. *State v. Diggs*, 272 Kan. 349, 362, 34 P.3d 63 (2001). This court's review of the issue is the same, however, whether or not an objection was made at trial if the claimed error implicated a defendant's right to a fair trial and denied the defendant his or her Fourteenth Amendment right to due process. *Pabst*, 268 Kan. at 504; *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 5, 979 P.2d 1239 (1999).

Davis first takes issue with a statement the prosecutor made during closing argument:

"I would suggest to you, once again, if you use your common sense, you'll know that when a person is in an emotional state to the extent described by Officer Hardesty and Officer Bray, that what comes out of their mouth is more likely the truth than something that comes ten months later with plenty of time for reflection and creation."

Davis argues that the prosecutor's allegation that he had 10 months to reflect on the events of that evening and come up with a story for the jury was equivalent to calling Davis a liar.

The second statement that Davis takes issue with was also made by the prosecutor during closing argument:

"The bottom line, ladies and gentlemen, is if you believe [S.K.F.] and all of the corroborating evidence presented to show that she was telling the truth, then Quincy Davis is guilty of every single charge alleged by the State. There is no discussion, and I would suggest to you that the evidence has shown that [S.K.F.] should be believed by you and that you should return verdicts on all of those counts."

The State maintains Davis has taken the prosecutor's statements out of context, noting that both statements were made when the prosecutor was demonstrating how the evidence supported S.K.F.'s testimony and was part of a summary that followed recitation of the detailed physical and circumstantial evidence that supported the credibility of S.K.F.

The prosecutor did not blatantly call Davis a liar. Instead, the prosecutor, in a case in which two conflicting stories were before the jury, stated reasonable inferences based upon the evidence. Furthermore, the prosecutor's comments did not constitute vouching for S.K.F.'s credibility. See *Campbell*, 268 Kan. 529 (court recognized that prosecutor's comments during closing argument did

not rise to level of constituting vouching for credibility and were within considerable latitude allowed prosecutor during closing argument).

Davis also takes issue with the following comment during the prosecutor's rebuttal in closing argument:

"The defense would have you believe that [S.K.F.] set this whole thing up, that she started thinking apparently a couple of weeks before about how she was going to get [Johnson], or, pardon me, to get [Davis] in trouble for doing what she wanted to do. And I would suggest to you that that would require someone who had very, very high intelligence, very, very cold, cold blood. And from [S.K.F.]'s testimony, I would suggest to you that simply is not the case."

Davis contends that through this comment the prosecutor vouched for the State's witness.

This comment was in response to defense counsel's reference in closing to what defense counsel believed to be unbelievable testimony of S.K.F. Again, the prosecutor was drawing the jury's attention to the evidence, specifically S.K.F.'s testimony, and stating a reasonable inference that based upon her testimony, S.K.F. was not the type of person to have plotted Johnson's death and pinned it on Davis.

These remarks are within the latitude afforded the prosecutor during closing argument.

## Criminal History Score

Davis contends the sentencing court erred in calculating his criminal history score and that, therefore, he is entitled to resentencing. Specifically, Davis asserts that because his prior aggravated battery conviction, Case No. 97CR812, was an element of his conviction for criminal possession of a firearm in this case, the prior crime cannot be used in calculating his criminal history.

In support of his argument, Davis relies upon K.S.A. 21-4710(d)(11), which states:

"Except as provided in K.S.A. 21-4716, and amendments thereto, the following are applicable to determining an offender's criminal history classification:

"(11) Prior convictions of any crime *shall not* be counted in determining the criminal history category if they enhance the severity level or applicable penalties, elevate the classification from misdemeanor to felony, or *are elements of the pres-*

*ent crime of conviction.* Except as otherwise provided, all other prior convictions will be considered and scored." (Emphasis added.)

The State admits Davis' 1997 conviction for aggravated battery was used in determining Davis' criminal history score and in calculating his sentence for aggravated kidnapping. The State contends, however, that the aggravated battery conviction was not used in calculating Davis' sentence on criminal possession of a firearm or the other offenses. Thus, the State asserts the sentencing court did not err in calculating Davis' criminal history score, relying for support upon *State v. Vontress*, 266 Kan. 248, 970 P.2d 42 (1998).

Resolution of this issue requires interpretation of the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.* Interpretation of the KSGA is a question of law over which this court's scope of review is unlimited. *State v. Campbell,* 273 Kan. 414, 44 P.3d 349 (2002); *State v. Taylor,* 262 Kan. 471, 478, 939 P.2d 904 (1997).

Davis' criminal history worksheet indicated that Davis had three prior person felony convictions: aggravated assault (93CR1919), attempted aggravated burglary (93CR1919), and aggravated battery (97CR812). The journal entry of judgment lists Davis as having a criminal history score of A. This score is equivalent to a defendant with three or more prior person felonies. See K.S.A. 21-4709.

As charged in the complaint, in order to support Davis' conviction for criminal possession of a firearm, he must have been convicted of a felony within the 10 years preceding the possession of a firearm that serves as the basis for the charge. See K.S.A. 2001 Supp. 21-4204(a)(4)(A). Davis stipulated that he was convicted of a felony in 1997.

This court dealt with this issue in *Vontress,* 266 Kan. 248. In *Vontress,* the defendant was convicted of first-degree murder, aggravated robbery, aggravated battery, and criminal possession of a firearm. A prior felony that served as an element of the charge of criminal possession of a firearm was used in calculating the defendant's criminal history for his conviction of aggravated robbery. The defendant contended, as does Davis in this case, that the sentencing court erred in including the prior felony in his criminal

history score because an element of a crime of conviction cannot also be used in calculating criminal history.

The *Vontress* court found as follows:

"In cases of multiple convictions arising out of the same complaint, the sentencing court identifies the defendant's primary crime, *i.e.*, the crime with the highest severity level, and computes the defendant's base sentence. The defendant's full criminal history is applied to the primary crime to establish the defendant's base sentence. K.S.A. 21-4720(3). An off-grid crime shall not be used as the primary crime in determining the base sentence. K.S.A. 21-4720(2). The criminal history score shall not be applied to nonbase crimes. K.S.A. 21-4720(5).

"The exclusion in K.S.A. 21-4710(d)(11) does not pertain to any conviction where the prior felony does not provide an element of the offense or in some manner affect the penalty applicable to the conviction of the crime. Vontress' criminal history score was not applied to his conviction for criminal possession of a firearm. Aggravated robbery was the primary crime for purposes of application of Vontress' criminal history score. The firearm conviction was not Vontress' primary crime. As a nonbase crime, a criminal history score of I was applied to the firearm conviction. Therefore, the prior felony was used as an element of the status crime and not used to establish the penalty for the firearm conviction. The sentencing court applied the felony conviction to that crime." 266 Kan. at 260.

Davis' primary crime was aggravated kidnapping. The criminal history score of A was only applied to determine the sentencing range for that offense. See K.S.A. 21-4720(b)(3). As provided by statute, sentences on the secondary offenses of aggravated burglary, aggravated robbery, and criminal possession of a firearm were calculated without a criminal history score. See K.S.A. 21-4720(b)(5) and K.S.A. 21-4709. A prior felony within 10 years was not an element of the conviction for aggravated kidnapping; thus, the sentencing court did not err in calculating Davis' criminal history score.

## Failure to Instruct on Lesser Offense of Second-degree Murder

Davis contends the trial court erred in instructing the jury that it must first consider whether Davis was guilty of first-degree premeditated murder before considering any lesser included offenses. The State disagrees, arguing that the instruction was not erroneous.

The jury was instructed as follows on the lesser included offense of second-degree murder:

"If you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Davion Johnson;

"2. That this act occurred on or about the 25th day of January, 2000, in Sedgwick County, Kansas."

Davis' trial counsel did not object to this instruction. Thus, on appeal, this court is limited to considering whether the instruction was clearly erroneous. K.S.A. 2001 Supp. 22-3414(3); *Saenz*, 271 Kan. at 346.

In support of his assertion that the instruction was erroneous, Davis relies upon K.S.A. 21-3109, which states:

"A defendant is presumed to be innocent until the contrary is proved. When there is a reasonable doubt as to his guilt, he must be acquitted. When there is a reasonable doubt as to which of two or more degrees of an offense he is guilty, he may be convicted of the lowest degree only."

Davis asserts that K.S.A. 21-3109 requires that a jury consider all instructions, *i.e.*, both of the charged crime and its lesser included offenses, at the same time. He argues that the instruction in this case violated K.S.A. 21-3109 because it allowed the jury to sign the verdict form without first considering the lesser included offense of second-degree murder.

This court addressed the same argument in *State v. Roberson*, 272 Kan. 1143, 38 P.3d 715 (2002), *cert. denied* 537 U.S. 829 (2002). In *Roberson*, the defendant contended that the trial court erred in instructing the jury that it should consider the lesser included offenses to premeditated murder only if the jurors did not agree the defendant was guilty of the charged offense. The *Roberson* court rejected the defendant's argument, reasoning as follows:

"The pattern instructions offer an orderly method of considering possible verdicts. The pattern instructions offer a transitional statement that can be inserted at the beginning of the elements instructions of lesser offenses. For example, in this case the trial court used the pattern instruction transitional statement between the charged offense and the next less serious of the lesser offenses: 'If you do not agree that the defendant is guilty of murder in the first degree, you should then

consider the lesser included offense of murder in the second degree-intentional.'
Then the trial court instructed on the elements of the lesser offense of second-
degree intentional murder.

"Roberson's complaint about the approved pattern method of considering pos-
sible verdicts is that the jury supposedly cannot consider the lesser offense until
after rejecting conviction on the greater offense. In *State v. Korbel*, 231 Kan. 657,
661, 647 P.2d 1301 (1982), the court rejected a similar challenge to the words 'if
you cannot agree' when used to preface an instruction on a lesser charge. The
court stated that the words

> 'are not coercive and do not require the members of a jury to unanimously
> find the accused innocent of the greater charge before proceeding to consider
> a lesser charge. The words 'if you cannot agree' presuppose less than a unan-
> imous decision and no inference arises that an acquittal of the greater charge
> is required before considering the lesser.' 231 Kan. at 661.

"The jury is instructed that the charged offense, in this case first-degree murder,
includes lesser offenses. Here the jury was instructed, according to PIK Crim. 3d
68.09, that the charged offense includes lesser offenses and that defendant may
be found guilty of the charged offense, a lesser offense, or may be found not
guilty. The court instructed the jury: 'You may find the defendant guilty of murder
in the first degree, murder in the second degree-intentional, murder in the second
degree-unintentional, voluntary manslaughter, involuntary manslaughter or not
guilty.' The trial court further instructed the jury that '[w]hen there is a reasonable
doubt as to which of two or more offenses defendant is guilty, he may be convicted
of the lesser offense only.' See K.S.A. 21-3109. Taking these instructions together
with the elements instructions, the jury was fully and accurately informed that it
could consider the lesser offenses, and the jury had an orderly method for doing
so." 272 Kan. at 1154-55.

Davis asserts that *Roberson* was erroneously decided because
K.S.A. 21-3109 requires all instructions to be considered as a
whole. It is unknown what language within K.S.A. 21-3109 Davis
is referring to as establishing the requirement that all instructions
be considered together and at the same time. Such a requirement
does not exist.

As in *Roberson*, the jury members in this case were instructed
in accordance with PIK Crim. 3d 68.09:

"The offense of first degree murder with which the defendant is charged in-
cludes the lesser offense of second degree murder.

"You may find the defendant guilty of first degree murder, second degree mur-
der or not guilty.

"When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only.

"Your Presiding Juror should sign the appropriate verdict form."

This instruction parallels the language of K.S.A. 21-3109, which Davis erroneously contends was violated in this case.

In addition to the two instructions previously discussed, the jury members were also instructed that they had a duty to consider and follow all of the instructions. They were instructed that each crime charged against the defendant was a separate and distinct offense and that each offense must be decided separately on the evidence and law applicable to it, uninfluenced by a decision on any other charge. They were also instructed that if they had reasonable doubt as to the truth of any of the claims required to be proved by the State, the defendant must be found not guilty; however, if they had no reasonable doubt as to the truth of any of the claims required to be proved by the State, the defendant should be found guilty.

As this court has repeatedly recognized, the propriety of jury instructions is to be gauged by the consideration of the whole, each instruction being considered in conjunction with all other instructions in the case. *State v. McNaught*, 238 Kan. 567, 584, 713 P.2d 457 (1986); *State v. Price*, 233 Kan. 706, 711, 664 P.2d 869 (1983); *State v. Korbel*, 231 Kan. 657, Syl. ¶ 6, 647 P.2d 1301 (1982).

After reviewing all the instructions, the jury was informed that it could consider the lesser included offense of second-degree murder. Therefore, the trial court's instruction was not clearly erroneous.

Affirmed in part, reversed in part, and remanded for resentencing.